LONGVIEW FIBRE COMPANY, James River II, Inc., Boise Cascade Corporation, and Weyerhaeuser Company, Petitioners,

and

Columbia River United and Dioxin/Organochlorine Center, Petitioner–Intervenor,

v.

Dana A. RASMUSSEN, Regional Administrator, and the United States Environmental Protection Agency, Respondents.

COLUMBIA RIVER UNITED AND DIOXIN/ORGANOCHLORINE CENTER, Petitioner,

v.

Dana A. RASMUSSEN, Regional Administrator, and the United States Environmental Protection Agency, Respondents.

Nos. 91–70389, 91–70398.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1992.

Decided Dec. 8, 1992.

Beth S. Ginsberg and Karen M. McGaffey, Bogle & Gates, Seattle, Wash., for petitioners.

Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, Wash., for petitioner-intervenor and petitioner.

Christopher S. Vaden and Diane M. Connolly, Barry M. Hartman, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Roland Dubois, E.P.A., Washington, D.C., and Adrianne Allen, E.P.A., Seattle, Wash., for respondents.

Before PREGERSON, TROTT and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Several pulp mills and environmental advocacy organizations petition for review of a Clean Water Act determination by the Environmental Protection Agency. The EPA issued limits on dioxins discharged into the Columbia River, which the pulp mills claim are too stringent and the advocacy groups claim are too liberal. The limits are called total maximum daily loads.[1] We conclude that we lack jurisdiction, so we do not reach the merits of the challenge. Accordingly, we grant the EPA's motion to dismiss.

## I. THE EPA DECISION.

The EPA established a total maximum daily load limit on discharges of dioxin into the Columbia River Basin. The decision document explains that "concentrations of dioxin in the Columbia River ... are below levels which can be measured," but fish accumulate dioxin, and it "has been found at detectable levels in the tissue of fish taken from the Columbia River Basin."

Before the EPA adopted its limit, the affected states, Washington, Oregon, and Idaho, adopted water quality standards. The most stringent of these, adopted by Oregon, allowed for 0.013 parts of dioxin per quadrillion, a figure selected on the basis of an estimated projection of one excess cancer case per million people assuming lifetime exposure to drinking the water and eating the fish. The three states asked the EPA to adopt a total maximum daily load as a federal action, and it did so, using the Oregon water quality standard.

Dioxin enters the river from numerous sources, including pulp and paper mills, other industrial sites, municipal wastewater treatment plants, runoff in agricultural areas, runoff in urban areas, and release from sediments on the bottoms of the riv-

---

1. To assist specialists in the field, who may perform computer searches by acronyms, we note that the case involves the CWA, specifically WLA's established as part of the TMDL's issued by the EPA pursuant to a WQS, which are implemented in NPDES permits. The opinion is written in words rather than acronyms to make it easier to read. Statutory provisions are referred to by section numbers in the United States Code rather than, as is often done in environmental law cases, section numbers in the original Act, to make them easier to find.

ers. Because dioxin is immeasurably diluted at a concentration of 0.013 parts per quadrillion, the total maximum daily load is a regulatory device applied to control how much dioxin the pulp mills discharge into the water, rather than what can be measured in the water after the discharges. The mills claim that their waste load allocations based on the total maximum daily load are also too small to measure, so that they are exposed to $25,000 a day penalties but are unable to determine whether they are in compliance. The EPA decision document explains that the load figure is more stringent than that which would allow .013 parts per quadrillion, in order to afford a "margin of safety" taking into account "lack of knowledge," as required by the controlling statute. The decision document explains that data on dioxin discharges from wood treatment facilities, municipal wastewater treatment plants, agricultural sites, urban areas, and release from bottom sediments, "are minimal or nonexistent."

The EPA generated a figure of 2.38 milligrams per day of allowable dioxin discharge for all of the chlorine-bleaching pulp mills, to be divided up among them in their permits. The EPA rejected the zero discharge proposal of the advocacy organizations, on the ground that it was "not necessary to achieve water quality standards and would not be enforceable" because discharges must reach a certain level before they can be measured. The EPA rejected the pulp mills' proposal that their permissible discharges be calculated on the basis of dividing up the amount of discharges which would be within the water quality limit, 5.96 milligrams per day for all the mills, because of "lack of information" on other sources and concern over release and buildup in fish and other organisms in the river. The 2.38 milligrams per day figure was based on allowing the mills, including a Canadian mill not subject to EPA regulation, to discharge 40% of the assumed capacity for dioxins of the Columbia River Basin.

## II. JURISDICTION TO REVIEW.

■ Both the mills and the advocacy organizations timely petitioned for review to this court from the EPA total maximum daily load determination. Our jurisdiction is limited to what the political branches have assigned to us by statute. *Russell v. Law Enforcement Assistance Administration*, 637 F.2d 1255, 1257 (9th Cir.1980). The Clean Water Act review procedure is gnarled and hazardous. There are four possibilities: (1) review by the court of appeals of EPA action; (2) review by the district court with appeal to the court of appeals; (3) review by the states which set the water quality standards giving rise to the total maximum daily load limitations; (4) no review. A special hazard arises when review is available directly to the court of appeals, because availability of direct review forecloses review in certain enforcement proceedings. We conclude that the second alternative is the best reading of the statutes. The EPA conceded at oral argument that if its motion to dismiss the appeal for lack of jurisdiction were granted, as it is by our decision, then review of EPA's action would be available in the district court. We determine de novo our jurisdiction to review. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 554 (9th Cir.1992); *Love v. Thomas*, 858 F.2d 1347, 1352 n. 9 (9th Cir.1988).

Our jurisdiction to review EPA Clean Water Act determinations is established by 33 U.S.C. § 1369(b)(1):

> Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(1) of this title, may be had by any

interested person in the Circuit Court of Appeals of the United States.

The petitioners argue that review is available most plainly under under subsection (E), and also under subsections (C) and (D).

■ The problem with petitioners' position is that the EPA issued the total maximum daily load limits under 33 U.S.C. § 1313. Every subsection of the review statute lists a particular statutory section or group of sections by number for which review is available under that subsection. Section 1313 is not listed. Petitioners argue that exclusion of section 1313 makes no sense, because the purposes served are similar to those of the listed sections. Although we see the practicality of the petitioners' argument, we cannot bring ourselves to conclude that Congress would have listed so precisely the sections for which review obtains in the courts of appeals, yet meant to include an unlisted section by implication.

### A. *Section 1313.*

The section pursuant to which the EPA issued the limits requires states to establish water quality standards subject to EPA approval, and requires periodic review of the water quality standards by state governors and state water pollution control agencies. 33 U.S.C. § 1313(a), (c). The states must also identify waters for which effluent standards under §§ 1311(b)(1)(A) and (b)(1)(B) are not stringent enough to implement the water quality standards, and establish total maximum daily loads, subject to EPA approval, for certain pollutants. 33 U.S.C. § 1313(d)(1)(C). *See Natural Resources Defense Council v. U.S.E.P.A.*, 915 F.2d 1314 (9th Cir.1990). In the case at bar, all three states declined to adopt total maximum daily loads, and asked that EPA do so as a federal action. The EPA action is in the form of a disapproval of action by the states and imposition of standards by the EPA, under 33 U.S.C. § 1313, although the states requested the disapproval.

### B. *Subsection (E).*

■ The petitioners' strongest argument relies on subsection (E) of the review provi-

sion. Subsection (E) assigns to this court review of the Administrator's action "in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title." 33 U.S.C. § 1369(b)(1)(E).

The parties agree that a total maximum daily load is an "effluent limitation." An "effluent limitation" is a "restriction ... on quantities, rates, and concentrations ... discharged from point sources." 33 U.S.C. § 1362(11). The EPA cites its own regulations, which define a total maximum daily load as the sum of individual waste load allocations, which are "a type of water quality-based effluent limitation." 40 C.F.R. 130.2(h), (i) (1990). The petitioners do not dispute this part of the argument, so we have no occasion to rule upon it.

Although the EPA concedes that the total maximum daily load is an effluent limitation, it argues that only effluent limitations under the listed statutes fall within subsection (E). This narrows the dispute about subsection (E), *"any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title,"* (emphasis added), to two issues. First, does the listing of statutes modify "any effluent limitation," or does it modify only "other limitation[s]?" Plainly an "other limitation" must fall under one of the listed statutes. Second, if the listing does modify "effluent limitation[s]," can the total maximum daily load be considered a section 1311 limitation?

#### 1. Does the modifier reach back?

The first issue arises out of the syntax in the statute, "any x or y under z." Does this mean that both x and y must be under z, or does it mean that only y need be under z? Grammatically, either interpretation could be correct, and the latter interpretation would more likely be right. "Subordinate clauses should be placed near the words they modify." Margaret Shertzer, The Elements of Grammar 47 (1986). That is why we say, "As I was flying into Ketchikan, I saw a pod of whales," not "I

saw a pod of whales flying into Ketchikan."

Petitioners argue that the list of statutes modifies only the closer antecedent, "other limitation[s]," not "effluent limitation[s]." The canons of statutory construction include the principle that "[r]eferential and qualifying phrases, where no contrary intention appears, refer solely to the last antecedent." 2A Singer, Sutherland—Statutory Construction § 47.33 (5th ed.1992).

■ Syntax cannot always control construction. The legislative process may have subordinated clear writing to some other goal. We must examine the meaning of the words to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress. Read for rational purpose, the syntactically disfavored construction of section 1369(b)(1)(E) is sensible, the other as unlikely as the flying whales. For the list of statutes to modify only "other" and not "effluent" limitations, the category of "other" limitations could not include any "effluent" limitations. But section 1312, one of the listed statutes, deals solely with "effluent limitation[s]." Because Congress included a statute dealing *only* with "effluent limitation[s]" in a modifier following the "other" limitations, Congress has to have intended the modifier to apply both to "effluent" and to "other" limitations. In this case, sense supersedes syntax.

The statute is coherent if the list of statutory references applies to both antecedents, "effluent limitation[s]" and "other limitation[s]." Although the syntax of the statute is ambiguous, its meaning is unambiguous, because one of the two possible constructions would have the absurd meaning, "non-effluent limitations under an effluent limitations statute." The Supreme Court, in another context, read the modifying phrase in subsection (E) as we do, to apply to an "effluent limitation," not just to "other" limitations, in *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 124–25, 97 S.Ct. 965, 973, 51 L.Ed.2d 204 (1977). The only sensible reading of section 1369(b)(1)(E), "any effluent limitation or other limitation under section 1311,

1312, 1316, or 1345 of this title," reads it as "any effluent limitation or other limitation, provided the effluent or other limitation is under section 1311, 1312, 1316, or 1345 of this title."

2. Is the limitation "under section 1311"?

Is the total maximum daily load "under section 1311"? The EPA says no, because the total maximum daily load was promulgated under section 1313. Petitioners say yes, because section 1311 encompasses all effluent limitations, and section 1311(b)(1)(C) encompasses section 1313 effluent limitations such as total maximum daily loads. We conclude that the EPA is correct.

Petitioners' strongest argument is that a House Conference Report says that section 1313 "is always included by reference" when section 1311 is listed:

The inserting of section [1313] into the series of sections listed in section [1341] is intended to mean that a federally licensed or permitted activity, including discharge permits under section [1342], must be certified to comply with State water quality standards adopted under section [1313]. The inclusion of section [1313] is intended to clarify the requirements of section [1341]. It is understood that section [1313] is required by the provision of section [1311]. Thus, the inclusion of section [1313] in section [1341] while at the same time not including section [1313] in the other sections of the Act where sections [1311, 1312, 1316, and 1317] are listed is in no way intended to imply that [1313] is not included by reference to [1311] in those other places in the Act, such as sections 1311, 1319, 1342 and *1369* and any other point where they are listed. *Section 1313 is always included by reference where section 1311 is listed.*

H.R.Rep. No. 830, 95th Cong., 1st Sess. 96 (Dec. 6, 1977) (emphasis added). The breadth of the emphasized language, would leave no room for debate, were it enacted into law.

■ This legislative history does not persuade us, because it is not part of the law,

was written long after the law was passed, and seems inconsistent with the law passed when it was written. This is 1977 "history" about a 1972 law. Instead of giving us a window into the thinking of the legislators who wrote the bill, it gives us the advice of someone on a House Conference Committee staff *five years after section 1369 was promulgated* about how we should construe a law passed by an earlier Congress under a different president in a different political era. Subsequent legislative history in the form of committee reports of subsequent congresses are generally considered an "extremely hazardous basis for inferring the meaning of a congressional enactment." *Consumer Product Safety Comm. v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 fn. 13, 100 S.Ct. 2051, 2061 fn. 13, 64 L.Ed.2d 766 (1980).

The amendment which is the subject of the conference committee report said "Section 401 ... is amended by inserting '303' after '302,' in the phrase 'section 301, 302, 306, and 307 of this Act,' and in the phrase 'section 301, 302, 306, or 307 of this Act', each time these phrases appear." P.L. 95–217 § 64, 91 Stat. 1566, 1599 (1977). Translating the Act references to Code references yields, "Section 1341 is amended by inserting '1313' after '1312,' in the phrase 'section 1311, 1312, 1316, and 1317 of the Act,' and in the phrase 'section 1311, 1312, 1316, or 1317 of this Act,' each time these phrases appear." Section 1341 sets out certification requirements, and includes the described list five times. This 1977 Act amends section 1341, not section 1369, and section 1369(b)(1)(E) has a different list. If the statement in the committee report were adequate to establish the construction it declares, then the statutory language enacted by the bill the history purports to explain would be superfluous. There would be no point in passing the referenced section of the 1977 law if the history were correct, and no point in writing the history if the law said what Congress intended. The law does not say what the "history" claims for it.

The statute explicitly distinguishes section 1311 effluent limitations from section 1313 effluent limitations. In the 1977 amendment just discussed, Congress found it necessary to amend section 1341 to add section 1313 to a list which had already included section 1311. A thermal discharge provision refers to "effluent limitations established under section [1311] or, if more stringent, effluent limitations established under section [1313]." 33 U.S.C. § 1326(c). That reference suggests that even where Congress regarded a section 1313 device as an "effluent limitation," nevertheless it did not regard it as the same thing as a section 1311 effluent limitation.

Petitioners correctly point out that section 1311(b)(1)(C) provides for "any more stringent limitation, including those necessary to meet water quality standards ... required to implement any applicable water quality standard...." But that is not enough to get a section 1313 total maximum daily load established in 1991 into an appellate statute designating section 1311. The section 1311 reference is in the context of establishing a "Timetable for achievement of objectives." 33 U.S.C. § 1311(b). It requires achievement of the described limitations "not later than July 1, 1977." 33 U.S.C. § 1311(b)(1)(C). The EPA points out that its regulatory process treats the section 1311(b)(1)(C) limitations separately from the section 1313 limitations, despite some similarity of purposes. 40 CFR § 122.44(d)(1)(vii)(B), § 122.44(d)(5) (1990). We are satisfied that the section 1313 total maximum daily load determination before us is not the same thing as a section 1311(b)(1)(C) limitation.

### 3. Is section 1313 excluded by implication?

The EPA argues, based upon the principle "expressio unius est exclusio alterius," that Congress' failure to include section 1313 in the review provision indicates that Congress intended to exclude this section from the provision. The petitioners argue that the *expressio unius* principle leads to an irrational result, so cannot be applied.

 Most strongly put, the *expressio unius,* or *inclusio unius,* principle is that "[w]hen a statute limits a thing to be done

in a particular mode, it includes a negative of any other mode." *Raleigh & Gaston Ry. Co. v. Reid,* 80 U.S. (13 Wall.) 269, 270, 20 L.Ed. 570 (1871). This is a rule of interpretation, not a rule of law. The maxim is "a product of logic and common sense," properly applied only when it makes sense as a matter of legislative purpose. *Alcaraz v. Block,* 746 F.2d 593, 607–608 (9th Cir.1984). Like the principle of construing a modifying clause to modify only the closer antecedent, the *expressio unius* principle describes what we usually mean by a particular manner of expression, but does not prescribe how we must interpret a phrase once written. Understood as a descriptive generalization about language rather than a prescriptive rule of construction, the maxim usefully describes a common syntactical implication. "My children are Jonathan, Rebecca and Seth" means "none of my children are Samuel." Sometimes there is no negative pregnant: "get milk, bread, peanut butter and eggs at the grocery" probably does not mean "do not get ice cream."

The specificity and precision of section 1369, and the sense of it, persuade us that it is designed to exclude the unlisted section 1313. *Cf. Boise Cascade Corp. v. U.S.E.P.A.,* 942 F.2d 1427, 1431–32 (9th Cir.1991). It would be an odd use of language to say "any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title" in § 1369(b)(1)(E) if the references to particular sections were not meant to exclude others. The negative pregnant is all the more obvious because in the six subsection provision at 1369(b)(1), each subsection specifies a particular statute or subsection of a statute; the distinctions are so fine that review of a "standard of performance under section 1316" is established by a different subsection from review of a "determination pursuant to section 1316(b)(1)(C)." 33 U.S.C. § 1369(b)(1)(A), (B). No sensible person accustomed to the use of words in laws would speak so narrowly and precisely of particular statutory provisions, while meaning to imply a more general and broad coverage than the statutes designated. In this case, expressio unius est exclusio alterius.

The Second Circuit has read section 1369 as we do:

> [T]he complexity and specificity of section [1369(b)] in identifying what actions of EPA under the FWPCA would be reviewable in the courts of appeals suggests that not all such actions are so reviewable. If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others.

*Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 (2d Cir.1976).

### 4. Other arguments for review.

Reviewability under section 1369 carries a peculiar sting. This sting cuts against petitioners' argument that a grant of appellate review should be construed liberally, because reviewability is presumed and bifurcation of review is undesirable. If an EPA action is reviewable under section 1369(b)(1), then it "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2). The Seventh Circuit warned that "the more we pull within [§ 1369(b)(1)], the more arguments will be knocked out by inadvertence later on—and the more reason firms will have to petition for review of everything in sight." *American Paper Institute v. EPA,* 882 F.2d 287, 289 (7th Cir.1989). Like the Second Circuit, we are influenced by the EPA's concession that the district court may review the EPA's section 1313 action under the Administrative Procedure Act, and "would be more skeptical of EPA's argument that we lack jurisdiction ... if EPA also argued that no court had jurisdiction." *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 n. 10 (2d Cir.1976).

The complexity of our exegesis necessarily gives us pause about its correctness. We see strength in the argument of Longview Fibre that the EPA construction unwisely fragments the process of review. A regulatory scheme so complex and difficult to construe forces anyone engaging in productive activity touched by the process to

hire a horde of lawyers, in order to find out what must be done to comply and to defend legitimate interests in the regulatory process. Those with money in the five figures and borrowed capital in the six or seven figures may be unable to do business, because they cannot afford the required overhead for legal assistance. We can tell from the briefs and arguments in this Clean Water Act case that tremendous resources in time and money and considerable legal skill have gone into finding out the proper address for an appeal, an activity which does not keep water clean and does not process wood pulp. The Fourth Circuit has commented on "the confusion caused by this poorly drafted and astonishingly imprecise statute." *E.I. du Pont de Nemours & Co. v. Train,* 541 F.2d 1018, 1026 (4th Cir.1976); *see also Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 626–27 (2d Cir.1976); *American Iron and Steel Institute v. EPA,* 526 F.2d 1027, 1074 (3d Cir.1975).

But the policy decisions on such matters are made by the political branches. We are persuaded that congress and the president decided to leave section 1313 out of the list of statutes in section 1369 for direct appeal from the EPA to the Court of Appeals. Our confidence in this construction is bolstered by the Second Circuit decision, which, though on a distinguishable rationale, reaches the same conclusion. *Bethlehem Steel Corp. v. Environmental Protection Agency,* 538 F.2d 513, 518 (2d Cir. 1976); *see* David Currie, Judicial Review Under Federal Pollution Laws, 62 Iowa L.Rev. 1221, 1244 (1977). Our decision is consistent with that of the Seventh Circuit, that EPA determinations under section 1313(d)(2) "are reviewable in an action in the *district* court under the judicial review provisions of the APA." *United States Steel Corp. v. Train,* 556 F.2d 822, 836 (7th Cir.1977) (emphasis added).

Petitioners also argue that the section 1313 total maximum daily load is functionally similar or closely related to section 1312, 1317 and 1342 limitations, for which appeal to the courts of appeals is permitted by section 1369(b)(1)(E), (C), and (F). While some similarities may be identified, they are not the same things, and as we explain above, we are persuaded that congress did not treat them the same way in the section on direct appeal, 33 U.S.C. § 1369(b)(1). Like the Second Circuit, we cannot read so specific and limited a list to have so general and non-exclusive a meaning as this argument requires. Had Congress intended a more general meaning, it would have used more general words.

The petition for review is DISMISSED for lack of jurisdiction.

PREGERSON, Circuit Judge, concurring.

I concur in the result.