567 S.E.2d 629

MONONGAHELA POWER COMPANY, West Virginia Power and Transmission Company, Timberline Utilities, Inc., and Martin Jefferson, Appellants Below, Appellees,

v.

CHIEF, OFFICE OF WATER RESOURCES, DIVISION OF ENVIRONMENTAL PROTECTION, and West Virginia Environmental Quality Board, Appellees Below, Appellants.

and

Monongahela Power Company, The Potomac Edison Company, West Penn Power Company and West Virginia Power and Transmission Company, Appellants Below, Appellees,

v.

Office of Water Resources, Division of Environmental Protection, Appellee Below, Appellant.

and

Ohio Power Company, Wheeling Power Company, Appalachian Power Company and Consolidation Coal Company, Appellants Below, Appellees,

v.

Chief, Office of Water Resources, Division of Environmental Protection, Appellee Below, Appellant.

No. 30105.

Supreme Court of Appeals of West Virginia.

Submitted April 2, 2002.

Decided July 1, 2002.

Gary Adamson Jack, Fairmont, West Virginia, for Monongahela Power Co., West Virginia Power and Transmission Co., Timberline Utilities, Inc.

David L. Yaussy, Robinson & McElwee, PLCC, Charleston, West Virginia, for Martin Jefferson, Ohio Power Co., Wheeling Power Co., Appalachian Power Co. & Consolidation Coal Co.

Perry D. McDaniel, Christopher D. Negley, Office of Legal Services, Charleston, West Virginia, for Department of Environmental Protection (DEP).

Eric G. Reeves, Utility Water Act Group, John W. Cooper, Blackwater River Watershed Association, Inc., F. Paul Calamita, West Virginia Municipal Water Quality Association, Inc., for amici curiae.

MAYNARD, Justice.

The appellant, the Secretary of the West Virginia Department of Environmental Protection, appeals the April 30, 2001 order of the Circuit Court of Kanawha County which reversed the Environmental Quality Board's March 26, 1999 and May 5, 1999 orders. In the 1999 orders, the Environmental Quality Board affirmed action taken by the Chief of the Office of Water Resources[1] of the Department of Environmental Protection to revoke or deny the renewal of Waste Load Allocations or National Pollutant Discharge Elimination System Permits to appellees Monongahela Power Company, West Virginia Power and Transmission Company, Timberline Utilities, Inc., and Martin Jefferson.

---

1. The Office of Water Resources is a subdivision of the West Virginia Department of Environmental Protection responsible for issuing National Pollutant Discharge Elimination System Permits and calculating Waste Load Allocations. Hereafter, we will refer to the Office of Water Resources simply as the Department of Environmental Protection or the DEP.

The Environmental Quality Board also found that it did not have jurisdiction to resolve appeals brought by appellees Monongahela Power Company, the Potomac Edison Company, West Penn Power Company, West Virginia Power and Transmission Company, Ohio Power Company, Wheeling Power Company, Appalachian Power Company, and Consolidation Coal Company. For the reasons explained below, we reverse and remand the April 30, 2001 order of the circuit court.[2]

## I.

## FACTS

The Federal Water Pollution Prevention and Control Act, 33 U.S.C. § 1251, *et seq.* (2000), commonly known as the Clean Water Act, requires each state, biennially, to submit to the Administrator of the Environmental Protection Agency ("EPA") a report on the water quality of the state's navigable waters.[3] This report is commonly known as a 305(b) report with reference to the applicable section of the Clean Water Act. In West Virginia, this report is submitted to the EPA by the Department of Environmental Protection ("DEP"). Included in this report is a classification of each water body or segment as fully, partially, or not supporting its designated use. A designated use is the use specified in water quality standards for each water body or segment, whether or not they are being attained.[4] Further, the DEP has promulgated different water quality standards based on the designated use of the water segment. A water segment found not

to be within its applicable water quality standard for its designated use is considered to be threatened or impaired.

The Clean Water Act also requires the DEP to generate a list of streams that do not meet water quality standards. This is known as a 303(d) list, with reference to the applicable section of the Clean Water Act. The DEP's 303(d) list must be approved by the EPA. Beginning in the year 2002, the DEP must submit the 303(d) list to the EPA by April 1 of every fourth year. The EPA is required either to approve the list submitted by the DEP, or issue a new list.[5]

For every stream appearing on the 303(d) list, the DEP must prepare a Total Maximum Daily Load which calculates the level of pollutants that can daily go into the stream without violating water quality standards. A stream's water quality standard is based on its designated use. The Total Maximum Daily Load is used to ensure that pollutant discharges do not exceed its maximum loads. Actual or proposed pollutant discharges which do not comply with the Total Maximum Daily Load must be eliminated or modified. Total Maximum Daily Loads must be submitted to the EPA with the 303(d) list. If the EPA disapproves of a Total Maximum Daily Load submitted by the DEP, or if the DEP fails to submit a Total Maximum Daily Load for an impaired stream, the EPA must establish the Total Maximum Daily Load.[6]

The DEP listed the Upper Blackwater River, which runs through Canaan Valley in Tucker County, West Virginia, as number 50 out of 51 impaired streams on its 1996 303(d)

---

**2.** At this juncture, we wish to note the appearance of amici curiae, Utility Water Act Group, Blackwater River Watershed Association, Inc., and West Virginia Municipal Water Quality Association, Inc., in this proceeding. We appreciate their participation in this case, and we have considered their arguments in conjunction with those of the appellees, whose position they support.

**3.** Although the temptation is great to utilize acronyms for the various legislative acts and technical environmental terminology discussed in this opinion, we refrain from doing so in the interest of readability. However, to assist those doing electronic research using any of the common acronyms for the legislative acts or other terms

discussed herein, we summarize that this opinion concerns the interaction between the federal CWA, the state WPCA, the DEP, and the EPA. We also consider the scope of the EQB's jurisdiction to hear appeals of actions involving WLAs and TMDLs. Finally, as noted in the body of the opinion, we utilize the common acronyms "EPA" for the Environmental Protection Agency and "DEP" for the Department of Environmental Protection.

**4.** 46 C.S.R. § 1–2.8 (2001).

**5.** 40 C.F.R. § 130.30 (2001).

**6.** 40 C.F.R. §§ 130.31, 130.34, and 130.35 (2001).

list.[7]  This listing was based on a water quality survey performed by the U.S. Geological Survey in 1990 through 1992.  West Virginia has established water quality standards for all of its surface waters.  These standards consist of three parts: numeric criteria, narrative criteria, and water use designation.  The Upper Blackwater is designated as a trout stream.  Therefore, its level of dissolved oxygen should not fall below six milligrams per liter.  The Upper Blackwater was listed as impaired due to low dissolved oxygen.  Specifically, the Geological Survey indicated that five measurements of dissolved oxygen levels were below applicable State standards of six milligrams per liter at the first monitoring site on the Blackwater main stem.

■■■  According to the DEP, it did not have the financial resources or professional expertise to prepare Total Maximum Daily Loads for streams listed as impaired.[8]  Therefore, pursuant to a consent degree executed in response to a federal lawsuit,[9] the EPA prepared a draft Total Maximum Daily Load for the Upper Blackwater dated October 22, 1997.  At the time the draft was issued, there were seven wastewater treatment facilities which discharged directly into the Upper Blackwater main stem, and a total of eight sources that discharged pollutants directly.

Waste Load Allocations are regularly issued by the DEP to those parties seeking to discharge wastewater into a stream at a future time.  A Waste Load Allocation is a calculation to determine a stream's capacity to assimilate potential discharge within the stream.  The acquisition of a Waste Load Allocation is a necessary step in completing an application for a National Pollutant Discharge Elimination System permit which actually allows the party to discharge a certain amount of wastewater into a stream on a regular basis.

The EPA's draft Total Maximum Daily Load stated:

> . . . because the [Upper Blackwater] River's [dissolved oxygen] resources are projected to be severely impacted at design low flow, any possible load reduction is desirable and, therefore, the unused [Waste Load Allocations] should be removed until such time that more detailed information is available to argue otherwise.

As a result of the draft Total Maximum Daily Load, appellee Martin Jefferson [10] and appellee Timberline Utilities, Inc. were informed on November 13, 1997 that their

---

7.  The circuit court defined the Upper Blackwater River as the part of the river upstream of Davis, West Virginia.

8.  This Court finds the DEP's reasons for not preparing its own Total Maximum Daily Loads, even though authorized to do so by the Clean Water Act, to be completely unacceptable.  State agencies simply cannot refuse to perform statutory duties because of an alleged lack of financial or professional resources.  Indeed, if these were valid reasons for government inaction, many crucial government functions simply would not get done.  In this era of tight government budgets, agencies somehow manage to continue to fulfill their legal obligations.  We expect no less of the DEP.

Moreover, the federal statutory scheme contemplates that the responsible state agency is to initially prepare the Total Maximum Daily Load and the EPA is to review it.  This guarantees that Total Daily Maximum Loads, which have such a significant impact on local landowners and businesses, will undergo a thorough and professional review prior to their implementation.  When the responsible state agency fails in its obligation to prepare the Total Maximum Daily Load ·so that

the EPA must do it, an important part of the review process is eliminated.

9.  See  Ohio  Valley  Environmental  Council (OVEC), et al. v. Browner, et al., United States District Court for the Southern District of West Virginia, Civil Action Numbers 2:95–0529 and 2:96–0091.

10.  According to evidence adduced before the Environmental Quality Board, Mr. Jefferson is a real estate developer who owns 91 acres of land in Canaan Valley.  He purchased this land in 1983 for $500,000 for development purposes.  In the Spring of 1997, he received a 40,000 gallon Waste Load Allocation from the DEP pursuant to completing his application for a National Pollutant Discharge Elimination System permit.  Mr. Jefferson planned on putting a 200–unit motel, a nine-hole executive golf course, and condominiums on his property.  However, on November 13, 1997, he received a letter from the DEP informing him that, in response to the EPA's draft Total Maximum Daily Load, his Waste Load Allocation was being withdrawn.  Mr. Jefferson testified that without the ability to get a National Pollutant Discharge Elimination System permit, the value of his property is reduced 40–50%.

Waste Load Allocations were being withdrawn.[11] At the same time, the DEP withdrew or denied renewal of Waste Load Allocations and National Pollutant Discharge Elimination System Permits to appellees Monongahela Power and West Virginia Power and Transmission Company.[12]

On or before December 13, 1997, the appellees filed appeals of the withdrawal of

their Waste Load Allocations to the State Environmental Quality Board. Thereafter, on February 20, 1998, the EPA issued its final Total Maximum Daily Load for the Upper Blackwater in which it did not alter its initial determination that no additional wastewater discharges should be allowed. The Environmental Quality Board held a two-day hearing in September 1998 in which the appellees presented copious testimony[13] chal-

11. A representative of Timberline testified before the Environmental Quality Board that over the last twelve years, Timberline developed plans for a recreational area in Canaan Valley to serve the local and Mid–Atlantic region. As part of its operation, Timberline sells small parcels of land in Canaan Valley to individuals. Timberline's representative claimed that, as a result of the withdrawal of its Waste Load Allocation, its potential for development is greatly reduced and the value of its small parcels has dropped from $30,000–$40,000 to $10,000.

12. According to evidence adduced before the Environmental Quality Board, these two companies own about 20,680 acres in Canaan Valley.

13. Testimony presented at the Board hearings included that of Mark Arcuri, 305(b) Coordinator in the DEP's Office of Water Resources. Mr. Arcuri stated that if a stream did not show violations of DEP criteria of at least 6 milligrams per liter of dissolved oxygen greater than ten percent of the time, he would not list the stream as impaired on the 303(d) list, and that he has never listed a stream because it was "threatened." He further testified that the Upper Blackwater was listed as impaired because the United States Geological Survey's QUAL–IIe computer modeling predicted that there would be violations of the DEP's six milligram-per-liter criteria without reductions in waste loads.

Richard S. Herd, an advisor in the Strategic Environmental Management Section of Allegheny Power, testified as an expert to several deficiencies in the Geological Survey computer modeling.

Ray Church, a consultant and real estate developer in Canaan Valley, testified about the economic damage to Canaan Valley caused by the withdrawal of Waste Load Allocations, his belief that the Upper Blackwater River cannot support a year-round trout population (a challenge to the DEP's designation), and the nature of the wastewater plants that currently discharge into the river.

Dr. L. Eli McCoy, Vice President and environmental consultant for Potesta & Associates and a former Director of the DEP, testified that his own approximately five-week sampling of the river showed that the river is not a polluted stream with a dissolved oxygen problem, and it can assimilate additional waste loads. He further testified that the DEP has flexibility

in implementing Total Maximum Daily Loads developed by the EPA. He admitted on cross-examination that his study did not encompass the yearly periods of highest use of the Upper Blackwater area which are July 4th weekend, peak leaf season in the first two weeks of October, and the week between Christmas and New Year's Day.

Dr. Carl W. Chen, a developer of computer models with Systech Engineering, testified that QUAL–IIe is a steady state computer model which may not be applicable to a study of the Upper Blackwater. This is because the QUAL–IIe assumes that the volume of water in a river is constant whereas there are flow changes in the Upper Blackwater. He also testified that the Geological Survey study exaggerates the wastewater load in the Upper Blackwater; the EPA's Total Maximum Daily Load is incorrect; and the Upper Blackwater has some assimilative capacity of wastewater loads.

Clifton Browning, Environmental Resource Program Manager with the DEP's Office of Water Resources, testified that he recommended placing the Upper Blackwater River on the 1996 303(d) list based on the Geological Survey study conducted between 1990 and 1992. He concluded that, although there were no indications of dissolved oxygen violations caused by wastewater discharges in 1996, if all permittees in Canaan Valley discharged up to the capacity of their permits, or there were additional wastewater allocations, there would be violations of the 6 milligram-per-liter dissolved oxygen criteria. He further testified that a stretch of the Upper Blackwater probably should not have been listed on the 1996 303(d) list. Finally, he opined that the Upper Blackwater is the only stream that he recommended listing as impaired due to computer modeling.

Lisa Burgess, a scientist with Potesta & Associates, testified that the DEP used two data sets in determining that the Upper Blackwater was impaired. One was a Geological Survey study conducted in 1990 – 1992 and the other was a Geological Survey study conducted in 1994 – 1996. According to Ms. Burgess, in the first study of 128 samples collected over eight monitoring stations on the river, only six showed dissolved levels below six milligrams per liter. Also, 22 miles of the 23.4 miles of stream showed no violations. Further, the second study also showed violations in less than five percent of the

lenging the Upper Blackwater River's designation as a trout stream, the listing of the Upper Blackwater on the DEP's 1996 303(d) list, the accuracy of the EPA's Total Maximum Daily Load, and the DEP's reliance on the Total Maximum Daily Load in withdrawing the Waste Load Allocations.

On March 26, 1999, the Environmental Quality Board issued an order affirming the DEP's decision either to withdraw or not renew the appellees' Waste Load Allocations and/or National Pollutant Discharge Elimination System Permits. The Board found as a matter of law that it does not have jurisdiction to decide whether the DEP's listing of the Upper Blackwater River on the 303(d) list was correct, and it does not have jurisdiction to revoke or modify the Total Maximum Daily Loads established by the EPA. Therefore, the Board concluded that it had no basis to reinstate the Waste Load Allocations or permits.

In the meantime, the DEP issued its 1998 303(d) list which also included the Upper Blackwater. This list was subsequently approved by the EPA. Appellees Monongahela Power Company, Potomac Edison Company, West Penn Power Company, West Virginia Power and Transmission Company, Ohio Power Company, Wheeling Power Company, Appalachian Power Company, and Consolidation Coal Company appealed this listing to the Board. This appeal was also dismissed for lack of jurisdiction in a May 5, 1999 order of the Board.

The appellees appealed the Board's March 26, 1999 and May 5, 1999 orders to the Circuit Court of Kanawha County. The Circuit Court reversed the Board and held:

> This Court reverses the decision of the Board and finds that the Board does have jurisdiction over the permit appeals brought by the Upper Blackwater appellants involving 303(d) listing decisions made by the Chief [of the Office of Water Resources] and [Total Maximum Daily Loads] for West Virginia Waters....

> [T]he Chief is ordered to delist the Upper Blackwater River from the 1996 and 1998 303(d) lists, and not to list it on future 303(d) lists until such time as sufficient evidence would warrant its listing. With the delisting of the Upper Blackwater River, the TMDL for the Upper Blackwater River is not necessary and is rendered moot. Moreover, that TMDL contains numerous errors ... and it should not be relied upon in its current form, for regulatory action. This Court finds that the Chief is not required to implement whatever TMDL the EPA may derive and must review and correct errors in the TMDLs performed by others for West Virginia streams. The Chief shall restore the Upper Blackwater appellants to their prior position and restore the Upper Blackwater appellants' wasteload allocations and proceed with processing any permit applications expeditiously.

> The Board is further ordered to hear the appeals of streams listed on the 1998 303(d) list, and determine whether the streams on the list qualify for listing in light of these findings of fact and conclusions of law, and to eliminate the category on the 1998 303(d) list for "Waterbodies With Biological Impairment." In the alternative, the 303(d) appellants have the option of waiting until the 303(d) listing results in a permit action affecting them, and taking a challenge to the 303(d) listing at that time.

The DEP now appeals the circuit court's order.

## II.

### STANDARD OF REVIEW

■ As noted above, in the case *sub judice*, the circuit court reversed an order of the Environmental Quality Control Board. We have previously explained that "[i]n cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit

---

samples. Finally, Ms. Burgess testified that the Geological Survey studies themselves attributed dissolved oxygen problems on the Upper Blackwater to natural conditions and not sewage loads.

Finally, Mindy Yeager, a senior scientist with Potesta & Associates, testified that the Upper Blackwater should not be designated as a trout stream because trout cannot survive in the river in the summer due to its water temperature.

court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law de novo." Syllabus Point 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

## III.

## DISCUSSION

The DEP first argues that the circuit court exceeded its authority by ordering it to remove the Upper Blackwater from the 1996 and 1998 303(d) lists; to refrain from relisting absent sufficient evidence; and to eliminate the category on the 1998 303(d) list for "Waterbodies with Biological Impairment." The only issue before the circuit court, according to the DEP, was whether the Environmental Quality Board had jurisdiction to review these issues.

The appellees respond that the circuit court properly found that the listing of the Upper Blackwater as impaired was error because ample evidence to support the circuit court's factual findings was presented to the Environmental Quality Board.

### A. The Environmental Quality Board's Authority to Review the 303(d) List

■ The first issue we consider is whether the Environmental Quality Board has jurisdiction to review 303(d) lists prepared by the DEP. The Board dismissed the appellees' appeals of the 303(d) listing of the Upper Blackwater River, in part, because it found that it did not have subject matter jurisdiction of the listing. The Board explained that a 303(d) listing is not a condition or term of a permitting action nor an order under W.Va.Code § 22–11–21. In reversing the Board, the circuit court found that the 303(d) listing was a final action by the Chief of the Office of Water Resources and thus constituted an "order" pursuant to W.Va. Code § 29A–1–2(e). In deciding this issue, we give no deference to the Board's and the circuit court's findings, but rather conduct a de novo review. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to de novo review." Syllabus Point 1, *Appalachian*

*Power Co. v. Tax Dept.*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

■ The Environmental Quality Board is a state agency which is created by statute and given specific powers including the power to make rules and to hear appeals of certain decisions of the Director of the DEP. W.Va.Code §§ 22B–3–1, *et seq.*, and 22–11–21 (1994). *See also* the Administrative Procedures Act, W.Va.Code § 29A–1–2(a) (defining agency as "any state board, commission, department, office or officer authorized by law to make rules or adjudicate contested cases, except those in the legislative or judicial branches"). As part of an administrative agency, the Board possesses only the authority granted to it by statute. "An administrative agency is but a creature of statute, and has no greater authority than conferred under the governing statutes." *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 16, 483 S.E.2d 12, 16 (1996) (citations omitted). Accordingly, we look to the applicable statutes to determine the power of the Environmental Quality Board.

W.Va.Code § 22–11–21 (1994) states:

Any person adversely affected by an order made and entered by the [Director of the Department of Environmental Protection] in accordance with the provisions of [the Water Pollution Control Act, W.Va. Code §§ 22–11–1, *et seq.*], or aggrieved by failure or refusal of the [Chief of the Office of Water Resources] to act within the specified time as provided in subsection (e) of section eleven [§ 22–11–11(e) ] of this article on an application for a permit or aggrieved by the terms and conditions of a permit granted under the provisions of this article, may appeal to the environmental quality board, pursuant to the provisions of article one [§ 22B–1–1 et seq.], chapter twenty-two-b of this code.

The issuance of a 303(d) list clearly is not a "failure or refusal of the [Chief of the Office of Water Resources] to act within the specified time." We further believe that it does not constitute a term or condition of a permit granted under the Water Pollution Control Act. The dispositive question then is whether a 303(d) list constitutes an "order" under W.Va.Code § 22–11–21.

W.Va.Code § 29A–1–2(e) (1982) of the Administrative Procedures Act defines an order as "the whole or any part of the final disposition (whether affirmative, negative, injunctive or declaratory in form) by any agency of any matter other than rule making[.]" According to 33 U.S.C. § 1313(d)(2) (2000), each State shall submit a 303(d) list to the Administrator of the EPA who shall either approve or disapprove of the list not later than thirty days after the date of submission. Further, federal regulations at 40 C.F.R. § 130.30 (2001) specifically provide that it is the responsibility of the EPA to issue an order approving or disapproving of the list and to issue a new list in the event it disapproves of the list developed by the DEP. We find, therefore, that a 303(d) list submitted to the EPA by the DEP is not a final disposition of a matter. Instead, it is essentially a recommendation and has no force and effect until approved by the Administrator of the EPA. Upon approval of the DEP's recommended list, the EPA, and not the DEP, issues the order which constitutes the final disposition of the matter.

█ Accordingly, we hold that the identification of impaired waters within the State by the West Virginia Department of Environmental Protection and the submission of a prioritized list of these waters to the Administrator of the Environmental Protection Agency for approval or disapproval, pursuant to 33 U.S.C. § 1313(d) (2000) of the Federal Water Pollution Prevention and Control Act, are not actions that are appealable to the Environmental Quality Board under W.Va. Code § 22–11–21 (1994). Therefore, we find that the circuit court erred in ruling that the Board has authority to review the 1996 and 1998 303(d) lists developed by the DEP.

## B. The Circuit Court's Authority to Review the 303(d) List

█ We next consider the circuit court's authority to review the 303(d) lists. "The general rule is that where an administrative remedy is provided by statute or by rules and regulations having the force and effect of law, relief must be sought from the administrative body, and such remedy must be exhausted before the courts will act." Syllabus Point 1, *Daurelle v. Traders Federal Savings & Loan Ass'n*, 143 W.Va. 674, 104 S.E.2d 320 (1958). We have determined, however, that there is no administrative remedy to challenge the DEP's development of a 303(d) list. "The rule requiring the exhaustion of administrative remedies does not apply where there is no administrative remedy provided by law and no such remedy exists." *Bank Of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W.Va. 245, 249, 183 S.E.2d 692, 695 (1971) (citations omitted).

█ The circuit court plainly has no jurisdiction to review a 303(d) list which has been approved by order of the EPA.[14] According to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.30(b) (2001), within 30 days of receipt of a 303(d) list, the EPA must issue an order approving or disapproving the 303(d) list in whole or in part. In the instant case, the EPA presumably issued orders approving of the 1996 and 1998 303(d) lists.[15] As noted above, a circuit court of this State does not have the authority to review an order of the EPA. Further, once the EPA issues an order approving of the DEP's list, the DEP must incorporate the list into its water quality management plan. 33 U.S.C. § 1313(d)(2) (2000); 40 C.F.R. § 130.30(d). Therefore, we find that the circuit court erred in ordering the DEP to delist the Upper Blackwater from the 1996 and 1998

---

**14.** We note, however, that 40 C.F.R. § 130.29(a) (2001) says that states may modify their 303(d) lists at times other than by April 1 of every fourth year provided they submit the modified lists to the EPA for approval. Part (c) of 40 C.S.R. § 130.29 further provides that states may "remove a listed waterbody for a particular pollutant if new data or information indicate that the waterbody is attaining and maintaining the applicable water quality standards for that pollutant." Nothing in this opinion should be read as relieving the DEP of its authority to modify its 303(d)

list whenever new information merits a modification.

**15.** According to 40 C.F.R. § 130.30(a) (2001), states must submit their 303(d) lists to the EPA by April 1 of every fourth year, beginning in the year 2002. We presume that the DEP has complied with this regulation. The record does not indicate whether the Upper Blackwater River is on the 2002 303(d) list or whether the EPA has taken action in regards to the list.

303(d) lists, and not to list the river on future lists until such time as sufficient evidence warrants.

In addition, because we find that the circuit court did not have the authority to review the 1998 303(d) list that was approved by order of the EPA, we also find that the circuit court erred in ordering the DEP to eliminate the category on the 1998 303(d) list for "Waterbodies With Biological Impairment." Accordingly, we reverse the circuit court's order to eliminate the category on the 1998 list for "Waterbodies With Biological Impairment." [16]

### C. Jurisdiction To Review Total Maximum Daily Loads

■ For the same reasons, we further find that the Environmental Quality Board and the circuit court lacked jurisdiction to review the Total Maximum Daily Load.[17] Like a 303(d) list, a Total Maximum Daily Load becomes an order only upon approval of the EPA, 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.34 (2001), and once approved by the EPA, the DEP must implement it. Therefore, the EPA's approval of the Total Maximum Daily Load and its implementation by the DEP are not reviewable by either the Environmental Quality Board or a circuit court.

■ Accordingly, we hold that the establishment of Total Maximum Daily Loads for pollutants of impaired waters within the State by the West Virginia Department of Environmental Protection and the submission of Total Maximum Daily Loads to the Administrator of the Environmental Protection Agency for approval or disapproval, pursuant to 33 U.S.C. § 1313(d) (2000) of the Federal Water Pollution Prevention and Control Act, are not actions that are appealable to the Environmental Quality Board under W.Va.Code § 22–11–21 (1994). Therefore, we find that the circuit court erred in

ruling that the DEP is not required to implement Total Maximum Daily Loads established or approved by the EPA.

Strong evidence was presented below, however, that the Total Maximum Daily Load developed for the Upper Blackwater River, which formed the basis for the adverse actions taken against some of the appellees, is flawed. The Board found in its March 26, 1999 order that "[t]he TMDL produced by the EPA did have flaws." While the Board further found that "[n]othing within the TMDL itself precludes a revision of the TMDL by the [Office of Water Resources] in the future[ ]," it concluded that the Office of Water Resources still lacked the resources to revise or redevelop the Total Maximum Daily Load. The Board did, however, strongly urge the Office of Water Resources to redevelop the Total Daily Maximum Load as soon as it can afford to do so.

■ This Court will go a step further. States are authorized by the Clean Water Act to establish Total Maximum Daily Loads for all identified impaired waterbodies. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.31(a). Also, we are unaware of any provision in the Clean Water Act that prevents a state from revising a Total Maximum Daily Load and submitting it to the EPA for its approval. Significantly, counsel for the DEP informed this Court during oral argument that the DEP will be assuming the task of establishing Total Maximum Daily Loads in the future. Accordingly, we remand to the circuit court for entry of an order directing the DEP to immediately update and revise the Total Maximum Daily Load for the Upper Blackwater River in order to correct its flaws, and to submit this revised Total Maximum Daily Load to the EPA for approval.

Furthermore, in the event the revised Total Maximum Daily Load is approved by the EPA, the DEP shall, at that time, stay the appellees' Waste Load Allocation or National Pollutant Discharge Elimination System Per-

---

**16.** We note also that the Environmental Quality Board did not take evidence on the biological impairment issue so that the circuit court had no evidentiary basis on which to rule on it.

**17.** In the instant case, the EPA established the Total Maximum Daily Load for the Upper Blackwater River in cooperation with the DEP. Once

the EPA establishes or approves a Total Maximum Daily Load, a state must incorporate it into the state's water quality management plan. 40 C.F.R. § 130.34(a)(6). Therefore, the DEP had no choice but to enforce the Total Maximum Daily Load established by the EPA.

mit denials or withdrawals pending a reassessment of the denials or withdrawals in light of the revised Total Maximum Daily Load. In addition, appellees Jefferson and Timberline shall be given a hearing on their Waste Load Allocation withdrawals within thirty days of the date of approval by the EPA of the revised Total Maximum Daily Load.

■■■ Finally, the appellees vehemently argue that due process entitles them to appeal 303(d) lists and Total Maximum Daily Loads to the Environmental Quality Board. After careful consideration of this issue, we must reject this argument. The Federal Clean Water Act is replete with provisions mandating that states provide public notice and an opportunity for public comment on the methodology for analyzing data, 303(d) lists, and Total Maximum Daily Loads prior to final submission to the EPA. 40 C.F.R. § 130.21(a)(7) (2001). In addition, if the EPA disapproves of a submitted 303(d) list or a Total Maximum Daily Load in part or in whole and subsequently modifies it, the EPA must provide public notice and an opportunity for public comment. 40 C.F.R. §§ 130.30(b)(3); 130.34(a)(4). Further, federal courts have held that EPA decisions concerning 303(d) lists and Total Maximum Daily Loads are reviewable in United States district courts. *U.S. Steel Corp. v. Train*, 556 F.2d 822 (7th Cir.1977), *abandoned on other grounds by City of West Chicago, Ill. v.*

*U.S. Nuclear Regulatory Com'n*, 701 F.2d 632 (7th Cir.1983); *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307 (9th Cir.1992).[18] Therefore, we believe that the appellees are provided with the requisite notice and right to be heard. While this Court sympathizes with the appellees' desire to have all issues heard in one forum, and we recognize that "Clean Water Act review procedure is gnarled and hazardous[,]" *Longview Fibre Company*, 980 F.2d at 1309, we nevertheless are bound by the Act's provisions.[19]

In summary, we find that the circuit court erred in ruling that the Environmental Quality Board has jurisdiction to review 303(d) lists developed by the DEP; in ordering the DEP to remove the Upper Blackwater River from the 1996 and 1998 303(d) lists, and to not list the river on future lists until such time as sufficient evidence warrants; in ruling that the DEP is not required to implement Total Maximum Daily Loads issued by the EPA; in ordering the DEP to restore the appellees to their prior position, restore their waste load allocations, and proceed with processing any permit applications expeditiously; and in ordering the elimination of the category on the 1998 303(d) list for "Waterbodies With Biological Impairment." Accordingly, the April 30, 2001 order of the Circuit Court of Kanawha County is reversed.

Further, we remand this case to the circuit court for entry of an order directing the

---

**18.** In support of their assertion that Congress intended the states, and not the EPA, to review stream designations as failing to meet quality standards under the Clean Water Act, the appellees cite *Roll Coater, Inc. v. Reilly*, 932 F.2d 668, 671 (7th Cir.1991); *P.H. Glatfelter Co. v. EPA*, 921 F.2d 516 (4th Cir.1990); *Hecla Mining Co. v. EPA*, 12 F.3d 164 (9th Cir.1993). However, we do not find these cases dispositive of the issues before us. *Roll Coater and Glatfelter* held that individual control strategies for toxic pollutants devised by states, pursuant to 33 U.S.C. § 1314(*l*) of the Clean Water Act, were reviewable by the states after revising discharging permits and not in federal district court. However, these decisions hinged on the fact that 33 U.S.C. § 1369(b)(1)(G), which specifically addresses judicial review of EPA 1314(*l*) actions, provided for review in federal court only of individual control strategies *promulgated* by the EPA and not those strategies proposed by states and *approved* by the EPA. In contrast, the development and/or approval of 303(d) lists and Total Maxi-

mum Daily Loads by the EPA are 1313(d) actions, not 1314(*l*) actions.

In addition, the *Hecla* court held that listing decisions under 33 U.S.C. § 1314(*l*) are merely preliminary steps and not final agency action reviewable in federal district court. Again, the instant case concerns actions under 1313(d), although admittedly the rationale utilized by the *Hecla* court could arguably be applied to 303(d) lists as well.

**19.** We note that there is nothing in federal law which prevents authorizing the Environmental Control Board to review DEP-prepared 303(d) lists and Total Maximum Daily Loads prior to their submission to the EPA for approval. In the interests of judicial economy and efficiency, we respectfully invite the attention of the Legislature to the matter of the scope of review of the Environmental Quality Board, specifically as it relates to providing persons affected by 303(d) lists and Total Maximum Daily Loads with a meaningful hearing of all issues in one administrative forum.

DEP to immediately update and revise the Total Maximum Daily Load for the Upper Blackwater River and to submit the revised Total Maximum Daily Load to the Administrator of the EPA for approval. In the event the Administrator approves the revised Total Maximum Daily Load, the DEP shall, at that time, stay all of the appellees' Waste Load Allocation and National Pollutant Discharge Elimination System Permit denials or withdrawals pending their reassessment in light of the revised Total Maximum Daily Load. Finally, appellees Jefferson and Timberline shall be given a hearing on their Waste Load Allocation withdrawals within thirty days of the EPA's approval of the revised Total Maximum Daily Load.

## IV.

## CONCLUSION

For the reasons stated above, the April 30, 2001 order of the Circuit Court of Kanawha County is reversed and this case is remanded to the circuit court for entry of an order as directed above.

Reversed and remanded with directions.