**ENVIRONMENTAL PROTECTION INFORMATION CENTER, a non-profit corporation, Plaintiff,**

v.

**PACIFIC LUMBER COMPANY, a Delaware corporation; Scotia Pacific Company LLC, a Delaware corporation; Environmental Protection Agency, a federal agency; and Christine Todd Whitman, in her capacity as EPA Administrator, Defendants.**

No. C 01–2821 MHP.

United States District Court,
N.D. California.

June 6, 2003.

Frank Shaw Bacik, John A. Behnke, Carter Behnke Oglesby & Bacik, Ukiah, CA, Christopher J. Carr, Bruce Stewart Flushman, Stoel Rives LLP, San Francisco, CA for Defendant.

Michael R. Lozeau, Deborah A. Sivas, Earthjustice Legal Defense Fund, Stanford, CA, for Plaintiff.

Mark A. Rigau, U.S. Dept. of Justice, Environmental & Natural Resources Div., San Francisco, CA, for Defendants U.S. Environmental Protection Agency, and Christine Todd Whitman, in her capacity as EPA Administrator.

## OPINION

PATEL, Chief Judge.

### Motions to Dismiss

Plaintiff Environmental Protection Information Center ("EPIC"), a non-profit environmental organization in Humboldt County, California, brings this action on behalf of itself and its members against Pacific Lumber Company and Scotia Pacific Lumber Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and Christine Todd Whitman as EPA Administrator. Pursuant to state law and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, EPIC seeks declaratory and injunctive relief, civil penalties, and restitution for PALCO's alleged discharge of pollutants into Bear Creek in Humboldt County. EPIC also challenges an EPA regulation that allegedly excludes PALCO's actions from permitting required by the CWA. Now before the court are separate motions to dismiss by PALCO and EPA. After having considered the parties' arguments, and for the reasons stated herein, the court rules as follows.

## BACKGROUND

### I. Factual Background [1]

At the heart of this action is the Bear Creek watershed, covering 5500 acres of

---

1. Unless otherwise noted, the facts in this section are taken from EPIC's Amended Complaint.

land in Humboldt County, California. Bear Creek, a tributary of the lower Eel River, is located several miles upstream of Scotia, California. Plaintiff EPIC alleges that there has been a dramatic increase in the amount of sediment deposited into Bear Creek—from approximately 8000 tons per year, before substantial logging in the area began, to 27,000 tons per year today. EPIC attributes the increase in sediment delivery to the logging activities of defendant Pacific Lumber Company and its wholly owned subsidiary, defendant Scotia Pacific Lumber Company, both of which are Delaware corporations with their principal places of business in Scotia. PALCO owns ninety-five percent of the land in the Bear Creek watershed and engages in logging throughout the watershed.

Specifically, EPIC alleges that the sediment increase is caused by PALCO's timber harvesting and construction of unpaved roads. EPIC contends that timber harvesting removes vegetation and makes soils more susceptible to erosion and landslides, and that the construction of unpaved roads exposes soils and destabilizes slopes. According to EPIC, rain carries the exposed silts and sediments—as well as other pollutants such as pesticides and diesel fuel—into culverts, ditches, erosion gullies and other alleged channels, and from there into Bear Creek.

A study conducted by PALCO consultants in April 1998 identified at least 179 specific sites in the watershed where sediments and other pollutants are deposited into Bear Creek and its tributaries. EPIC alleges that pollutant-laden water flows through, among other channels, 156 hillside culverts and 5.5 miles of roadside ditches that drain directly into stream-crossing culverts. PALCO has not applied for any permits for these sites, which EPIC contends should be regulated as point sources under the CWA. As a result

of PALCO's activities, EPIC maintains that there have been significant adverse impacts on the beneficial uses of Bear Creek, including the use of the creek by fish for nesting and rearing habitat. Moreover, EPIC believes that further activities proposed in PALCO's timber harvest plans, such as construction of additional roads, culverts and ditches, could increase the amount of sediment, silt, and other pollutants deposited into Bear Creek.

## II. *Statutory and Regulatory Background*

Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The "fundamental premise" of the CWA is that " 'the discharge of any pollutant by any person shall be unlawful' " unless authorized by the Act. *Natural Resources Defense Council ("NRDC") v. EPA,* 822 F.2d 104, 109 (D.C.Cir.1987) (citing 33 U.S.C. § 1311(a)). The CWA primarily uses an effluent limitation approach that regulates certain sources of pollutants, known as "point sources," through technology-based standards. *NRDC v. Train,* 510 F.2d 692, 695 (D.C.Cir.1974). Water quality-based standards supplement technology standards when necessary to further control pollution in a body of water. *NRDC v. EPA,* 822 F.2d at 110. In contrast to the "end-of-pipe" regulation of point sources, nonpoint sources of pollution are only indirectly controlled through state management programs. *See Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096–97 (9th Cir.1998), *cert. denied,* 528 U.S. 964, 120 S.Ct. 397, 145 L.Ed.2d 310 (1999). The CWA also directs the EPA to issue information on nonpoint sources of pollution. 33 U.S.C. § 1314(f).

A. *National Pollutant Discharge Elimination System*

The CWA prohibits the "discharge of any pollutant" except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342(a). NPDES permits are issued by either the EPA or a state with an approved program, such as California.[2] *Id.* § 1342(a)-(b). The term "discharge of a pollutant" is defined by the CWA as "any addition of any pollutant to navigable waters *from any point source.*" *Id.* § 1362(12)(A) (emphasis added). A "point source" is:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

*Id..* § 1362(14). The term "pollutant" is defined broadly by the Act to include such substances as rock and sand, as well as industrial, municipal and industrial wastes. *Id.* § 1362(6).

B. *Regulation of Silvicultural Sources*

After the CWA was enacted, EPA promulgated regulations that exempted certain categories of discharges from NPDES permit requirements, including "[u]ncontrolled discharges composed entirely of storm runoff," and some "[d]ischarges of pollutants from agricultural and silvicultural activities." 40 C.F.R. § 125.4 (1973). NRDC challenged the regulations in D.C. District Court, arguing that EPA did not have the authority to exempt categories of point sources from regulation. *NRDC v. Train,* 396 F.Supp. 1393, 1395 (D.D.C. 1975), *aff'd, NRDC v. Costle,* 568 F.2d 1369 (D.C.Cir.1977). The District Court agreed. *Id.* at 1396. In response to the District Court's decision, EPA promulgated a new regulation on silvicultural sources in 1976 that defined a silvicultural point source and gave examples of nonpoint sources in a comment.[3] 41 Fed.Reg. 24,709, 24,711 (June 18, 1976). When EPA repromulgated the regulation in 1980, the agency incorporated the comment in the text with slight changes to the language. 45 Fed.Reg. 33,290, 33,446–47 (May 19, 1980). The current regulation is identical to the one recodified in 1980 and defines a "[s]ilvicultural point source" as:

> any discernible, confined, and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. *The*

---

2. EPA delegated its permit-issuing authority to California on May 14, 1973. 39 Fed.Reg. 26,061 (July 16, 1974). California administers the NPDES program through the Porter–Cologne Water Quality Control Act ("Porter–Cologne Act"), Cal. Water Code § 13000 *et seq.,* which created Regional Water Quality Control Boards responsible for issuing Waste Discharge Requirements ("WDRs"). WDRs are equivalent to CWA permits, and for the purposes of this action, the Porter–Cologne Act imports all relevant definitions from the CWA, including those for "pollutants," "discharge," and "point source." *See* Cal. Water Code § 13373.

3. The regulation was originally codified as 40 C.F.R. § 124.85. 41 Fed.Reg. at 24,711. The nonpoint source provision was in a comment, and read as follows:

> This term does not include nonpoint source activities inherent to forest management such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, and road construction and maintenance from which runoff results from precipitation events.

*Id.*

*term does not include* non-point source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, *surface drainage, or road construction and maintenance from which there is natural runoff.*

40 C.F.R. § 122.27(b)(1) (emphasis added).

### C. *1987 Amendments on Municipal and Industrial Stormwater Discharges*

In 1987, Congress amended the CWA to include a section on municipal and industrial stormwater discharges. *See* Pub.L. No. 100–4, 101 Stat. 7 (1987) (codified as 33 U.S.C. § 1342(p)). Section 402(p)(2) mandates permits for stormwater discharges "associated with industrial activity," those from municipal storm sewer systems, and those that contribute to water quality violations or are "significant contributor[s] of pollutants." 33 U.S.C. § 1342(p)(2). In addition, section 402(p)(6) requires the EPA to designate other sources of stormwater pollution and "establish a comprehensive program to regulate" these discharges. *Id.* § 1342(p)(6). In 1990, the EPA issued regulations for the discharges identified in 402(p)(2), referred to as the "Phase I" regulations. 55 Fed.Reg. 47,990 (Nov. 16, 1990). The regulations were challenged and, for the most part, upheld by the Ninth Circuit. *American Mining Cong. v. EPA,* 965 F.2d 759, 762 (9th Cir. 1992); *NRDC v. EPA,* 966 F.2d 1292, 1295 (9th Cir.1992). In 1999, the EPA issued the regulations for the remaining sources in section 402(p)(6), also referred to as the "Phase II" regulations. 64 Fed.Reg. 68,-722 (Dec. 8, 1999). Once again, the regulations were mostly upheld by the Ninth

Circuit against challenges. *Environmental Def. Ctr. v. EPA,* 319 F.3d 398, 405 (9th Cir.2003).

### D. *Proposed Amendment to Silviculture Regulation*

In 1999, EPA proposed revising the 1976 silviculture regulation in order to "modify [the EPA's] current interpretation of the term 'point source' with respect to discharges associated with silviculture." 64 Fed.Reg. 46,058, 46,077 (Aug. 23, 1999). The proposed version would have left untouched the first sentence of the 1976 regulation, which lists the four types of sources considered to be point sources. The second sentence identifying nonpoint source activities would have been replaced. 64 Fed.Reg. at 46,088. In its stead, EPA proposed giving EPA and authorized states the opportunity to designate, on a case-by-case basis, stormwater discharges from silvicultural activities as point sources subject to NPDES permitting. *Id.*[4] The only silvicultural sources subject to the proposed revision were those Phase I stormwater discharges identified as either contributors to violations of water quality standards or as "significant contributor[s]" of pollutants to a body of water. *Id.* (requiring a designation under section 122.26(a)(1)(v), 40 C.F.R. § 122.26(a)(1)(v)); *see* 33 U.S.C. § 1342(p)(2)(E) (granting EPA the authority to require a permit for such discharges).

The 1999 revision was proposed in conjunction with comprehensive rulemaking on the establishment of "Total Maximum Daily Loads" ("TMDLs"). 64 Fed.Reg. 46,012 (Aug. 23, 1999). A TMDL defines the maximum amount of a pollutant that can be discharged, or "loaded," into a certain water body from all sources, including

---

**4.** EPA proposed to replace the second sentence with this text:

This term also includes discharges composed entirely of storm water from silvicul-

tural activities that are designated under 40 CFR 122.26(a)(1)(v) as requiring a 402 permit.

64 Fed.Reg. at 46,088.

point sources, nonpoint sources and natural background sources. *Dioxin/Organochlorine Ctr. v. Clarke,* 57 F.3d 1517, 1520 (9th Cir.1995). Section 303(d) of the CWA requires states to identify bodies of water that do not meet water quality standards even with technology-based pollution controls on point sources, then establish TMDLs and submit a list of waters and the TMDLs to EPA for review. 33 U.S.C. § 1313(d). EPA proposed that its case-by-case designation of silvicultural point sources be employed only when limitations on discharges were needed to achieve a TMDL. 64 Fed.Reg. at 46,088.

After considering comments on the proposal, EPA decided to retain the second sentence of section 122.27(b)(1) as promulgated in 1976. 65 Fed.Reg. 43,586, 43,652 (July 13, 2000).

### E. *Judicial Review Under the Clean Water Act*

The CWA, read in connection with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, creates a bifurcated jurisdictional scheme in which jurisdiction over certain claims against EPA is vested exclusively in the circuit courts, and the remainder are vested in the district courts. 33 U.S.C. §§ 1365(a), 1369(b)(1). Section 509(b) gives circuit courts original jurisdiction over challenges to certain actions by EPA Administrators, including "approving or promulgating any effluent limitation or other limitation under [four enumerated

sections of the Act, including section 301] and 'issuing or denying any permit under [section 402].' " 33 U.S.C. § 1369(b)(1)(E)-(F). If an action falls within the purview of subsection (b)(1), then it cannot be reviewed by a court in any civil or criminal enforcement action. 33 U.S.C. § 1369(b)(2). Other challenges to EPA actions may be brought in district courts either as citizen suits under section 505(a), or as APA claims based on general federal question jurisdiction. *Oregon Natural Res. Council v. United States Forest Serv.,* 834 F.2d 842, 852 n. 16 (9th Cir.1987) (citing 28 U.S.C. § 1331).[5]

### III. *Procedural History*

EPIC filed its complaint in this action on July 24, 2001, alleging that PALCO violated the CWA, the Porter–Cologne Act and California's Unfair Competition Law, Cal. Bus & Prof.Code § 17200 *et seq.*, by discharging pollutants into Bear Creek and its tributaries without a CWA permit. The suit was brought as a citizens suit under section 505(a) of the CWA, 33 U.S.C. § 1365(a). On August 16, 2001, the court denied EPIC's motion for a temporary restraining order. After PALCO moved to dismiss based in part on the silvicultural regulation, EPIC filed an amended complaint on September 24, 2001 with a third claim directly attacking the nonpoint source provision of the regulation pursuant to the APA.[6] On October 23, 2001, EPIC asked the North Coast Regional Water Quality Control Board ("Re-

---

**5.** Section 505(a) specifically vests jurisdiction in the district courts for private citizen suits against either a person who allegedly is in violation of pollution standards or an order by the EPA, or the EPA Administrator for a nondiscretionary act. 33 U.S.C. § 1365(a). If review is available under this section, the Ninth Circuit has stated that a plaintiff may not escape the applicable notice requirements by bringing an APA claim. *Oregon Natural Res. Council,* 834 F.2d at 851.

**6.** In its third claim of the amended complaint, EPIC alleges:

Defendant EPA's final decisions promulgating 40 C.F.R. § 122.27 and interpreting the language of that section on July 13, 2000 and February 12, 1976 are *ultra vires* acts. To the extent the application of 40 C.F.R. § 122.27 or EPA's interpretation of that regulation effectively exempt discharges of stormwater and pollutants from ditches, channels, pipes, culverts, manmade gullies, and other discrete conveyances associated with silvicultural activities to Bear Creek, its tributaries and other waters of the United States, those EPA decisions are in excess of statutory authority and thus should be set

gional Board"), the state entity responsible for issuing CWA permits for the waters in this action, to issue permits for "Pacific Lumber's sediment- and herbicide-laden discharges, especially from culverts, drainage ditches, gullies, and logging-induced erosion channels." Lozeau Dec., Exh. A at 1. Expressly applying EPA's interpretation of section 122.27 as discussed in its decision not to promulgate the 1999 proposed regulation, the Regional Board denied EPIC's request on November 7, 2001. Lozeau Dec., Exh. B at 1 (citing 65 Fed. Reg. 43,586, 43,651 (July 13, 2000)).

Now before the court are separate motions by EPA and PALCO to dismiss EPIC's amended complaint. EPA moves the court to dismiss EPIC's third claim, while PALCO urges the court to dismiss the entire action. As discussed below, the court will address the issue of its jurisdiction over EPIC's APA claim and the applicable statute of limitations. Because the court finds that it has jurisdiction and the action is not time-barred, the court requests further briefing from all parties on the remaining issues, including the merits of EPIC's challenge to section 122.27.

*LEGAL STANDARD*

I. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

 A party may challenge the court's jurisdiction over the subject matter of the complaint under Federal Rule of Civil Procedure 12(b)(1). A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack jurisdiction either "facially" or "factually." *See Thorn-*

*hill Publ'g Co. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). The burden to show jurisdiction lies with plaintiff. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("It is to be presumed that a cause lies outside this [court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted).

II. *Motion to Dismiss for Failure to State a Claim*

A motion to dismiss for failure to state a claim should be denied under Federal Rule of Civil Procedure 12(b)(6) "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir.1996) (citation omitted). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996) (citation omitted).

*DISCUSSION*

EPIC alleges that EPA's promulgation of the 1976 silvicultural regulation, as well as its subsequent decision in 2000 not to amend the regulation, were *ultra vires* acts that should be set aside under the APA, 5 U.S.C. § 706(2)(C), and were also arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).[7]

aside under 5 U.S.C. § 706(2)(C). Those EPA decisions also are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and thus should be set aside under 5 U.S.C. § 706(2)(A). Am. Compl. ¶ 64.

7. EPIC contends that it is challenging EPA's failure to promulgate effluent limitations for all silvicultural sources meeting the definition

of "point sources" and therefore should be heard in district court. EPIC relies on *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 266 (5th Cir.1989) ("NRDC does not complain that the effluent limitations promulgated by the Administrator to control toxic and nonconventional pollutants are in some way defective or deficient. Rather, petitioner seeks to compel the Administrator to promulgate

EPA and PALCO contend that this court lacks jurisdiction over EPIC's claim because section 509(b)(1) of the CWA gives the circuit courts exclusive jurisdiction over such a challenge.[8]

Even if this court does have jurisdiction, defendants argue that EPIC is essentially attacking the 1976 regulation, and thus the APA's six-year statute of limitations has long since run. EPIC replies that the statute of limitations should not apply to its claim because it is bringing an as applied challenge. In the alternative, EPIC contends that EPA re-opened the 1976 regulation in its 1999 proposed rulemaking. While EPA maintains that EPIC could only seek review of the agency's decision not to amend the regulation in the manner proposed by the rulemaking, PALCO reaches further to argue that there was no reviewable final agency action.

### I. *District Court Jurisdiction*

 The APA authorizes judicial review over final agency actions for which there is "no other adequate remedy in a court." 5 U.S.C. § 704. Other adequate remedy exists if the action is made reviewable by the provisions of the CWA. *Hayes v. Whitman,* 264 F.3d 1017, 1025 (10th Cir.2001) (availability of citizen suit claim precludes APA claim); *cf. Oregon Natural Res. Council,* 834 F.2d at 852 (finding that an APA claim could be made "[f]or

the reasons we expressed earlier concerning the unavailability of this type of action under the citizen suit provision of the CWA"). Thus, if section 509(b)(1) of the CWA allows EPIC to bring its claim in the circuit courts, EPIC may not bring an APA claim in this court. *Sun Enters., Ltd. v. Train,* 532 F.2d 280, 288 (2d Cir. 1976) (also stating that "there is a strong presumption against the availability of simultaneous review in both the district court and the court of appeals"). Defendants argue that EPIC's claim could have been brought in the courts of appeals, since the claim is properly understood as a challenge to an EPA Administrator's action in either "approving or promulgating any effluent limitation or other limitation under section 1311 [301 of the CWA]" or "issuing or denying any permit under section 1342 [402 of the CWA]." 33 U.S.C. § 1369(b)(1)(E)-(F). The court first looks to the statutory authority claimed by EPA in its rulemakings, then addresses whether the EPA action at issue in this action falls within the sections cited by defendants.

### A. *Statutory Authority for Section 122.27*

When EPA proposed the new silvicultural regulation in 1976, the agency listed three CWA provisions as authorities: section 304, section 402 and section 501. 41 Fed.Reg. 6281, 6283 (Feb. 12, 1976). Sec-

such regulations in the first instance. Such suits clearly lie within the exclusive jurisdiction of the district court."). In *Chemical Manufacturers,* the court found that petitioner's claim was to compel a non-discretionary duty by the EPA Administrator, and therefore jurisdiction was only to be had in the district courts under section 505(a). The gravamen of EPIC's claim goes to EPA's decision not to define certain silvicultural sources as point sources. As such, section 505(a) and *Chemical Manufacturers* are inapplicable.

**8.** EPA argues that this court should defer to circuit court jurisdiction because consolidated

challenges to the July 13, 2000 rulemaking are currently pending in the D.C. Circuit. *American Farm Bureau Fed'n v. Whitman,* No. 00–1320 (D.C.Cir. filed July 18, 2000). The EPA also admits, however, that the pending action does not include a challenge to the EPA's decision not to amend the silvicultural regulation. Because the EPA's decision regarding the silvicultural regulation is separable from the rest of the rulemaking, the presence of such an action does not determine whether this court has jurisdiction over EPIC's claim.

tion 304 requires EPA to develop and publish information on nonpoint source pollution. 33 U.S.C. § 1314(f). Section 402 establishes the NPDES permitting program, 33 U.S.C. § 1342, and section 501 grants EPA authority to promulgate regulations necessary to implement the CWA. 33 U.S.C. § 1361(a). In contrast, the preamble to EPA's 2000 decision not to amend the silvicultural regulation states that the "existing regulation of discharges from silvicultural sources was not compelled by the CWA." 65 Fed.Reg. at 43,-650. Instead, the regulation was promulgated "based on the interpretive authority for rulemaking under CWA section 501(a), which authorizes the Administrator to prescribe regulations that are necessary to carry out functions under the Act." *Id.*

■ Relying on the 2000 preamble, EPIC contends that EPA's "categorical exclusion" of certain silvicultural point sources from NPDES permitting in the second sentence of section 122.27(b)(1) was based only on section 501 of the CWA. Thus, sections 304 and 402 are authorities for the four activities in the first sentence, as the regulation subjected these activities to the NPDES program and the applicable effluent limitation guidelines.[9] Since EPIC is only challenging EPA's exclusion of certain point sources in the second sentence, and section 501 is not listed as one of the statutory provisions for which circuit court review may be had under section 509(b)(1), this court should have jurisdiction. EPA argues that its failure in 2000 to list other provisions does not mean that the second sentence of the silvicultural regulation was propounded *only* pursuant to section 501. Any CWA regulation is based, at least in part, on EPA's general rulemaking authority. Even though EPA failed to mention two of the three sections

in its most recent proposed rulemaking, all three sections should still be considered authorities for the entire regulation.

The court finds EPIC's argument unpersuasive for the reason that the second sentence of the silvicultural regulation is based on the authority of at least two CWA sections: section 304 and section 501. As stated in the 2000 preamble, EPA relied on section 501 for its general rulemaking authority. In addition, however, the EPA's authority to issue a regulation on nonpoint sources is found in section 304(f). This section directs the EPA to publish in the Federal Register "information including guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and processes, procedures, and methods to control pollution resulting from ... silvicultural activities ... including runoff from ... forest lands." 33 U.S.C. § 1314(f)(1), (f)(2)(A). By naming silvicultural nonpoint sources through example, the court finds that EPA acted within its authority under section 304(f)(1) to issue a guideline for identifying the nature of nonpoint sources, in this case a specific class of nonpoint sources. Neither section 304 nor section 501 invokes the jurisdiction of the appeals court under section 509(b)(1).

This court cannot ignore, however, that in defining certain silvicultural sources as nonpoint in nature, EPA determined the sources were not subject to the NPDES program. While there is a superficial logic to the argument that the EPA cannot issue a regulation on nonpoint sources under the authority of section 402, a section on point source permits, this argument ignores the context of the rulemaking. EPA proposed the regulation in 1976 in response to the D.C. District Court's decision striking

---

9. This attempt to ascribe a different rationale for the citation to section 304 is very strained. Section 304(b) does provide authority for EPA to issue effluent limitation guidelines, 33 U.S.C. § 1314(b), but the regulation at issue here is not such a guideline.

down a regulation excluding silvicultural point sources from the NPDES program. *NRDC v. Train,* 396 F.Supp. at 1396. In its preamble to the proposed regulation, the EPA declared that it had "carefully examined the relationship between the NPDES permit program ... and water pollution from silvicultural activities" to determine "that most water pollution related to silvicultural activities is nonpoint in nature." 41 Fed.Reg. at 6282. In 1999, the EPA proposed changing the "regulatory gap in coverage" for "a discrete category of 'non-point sources' excluded from the opportunity for regulation under the NPDES permitting program." 64 Fed. Reg. at 46,077. By its own admission, EPIC challenges EPA's determination to "categorically exempt" such sources from NPDES permitting. Thus, this court must address whether EPA's decision not to subject these sources to section 402 is an action invoking circuit court jurisdiction.

### B. Section 509(b)(1)(F): Issuing or Denying a Permit under Section 402

■ EPA argues that EPIC's challenge to section 122.27 is actually for review of an EPA action "in issuing or denying any permit under section 1342 [section 402 of the CWA]." 33 U.S.C. § 1369(b)(1)(F). This jurisdictional provision has been interpreted to include not only review of a simple issuance or denial of a permit but also of actions that involve a functional equivalent. *Crown Simpson Pulp Co. v. Costle,* 445 U.S. 193, 196, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980).[10] The Ninth Circuit, relying on D.C. Circuit case law, has also applied the provision to rules regulating underlying permit procedures. *NRDC v. EPA,* 966 F.2d at 1297. EPA contends

that its promulgation of a rule on the scope of NPDES permitting requirements for silvicultural sources falls within this broad interpretative penumbra, while EPIC maintains that a rule defining nonpoint sources by its very nature removes the sources from any NPDES permitting requirements, and thus any circuit court review of permitting. Because the court finds that the EPA action at issue is properly characterized as a regulation identifying a class of silvicultural sources that do not require NPDES permits, the applicable case law interpreting section 509(b)(1)(F) cannot support circuit court review of a challenge to such an agency action.

#### 1. Functional Equivalent Test

■ The Supreme Court has made clear that circuit court jurisdiction under section 509(b)(1)(F) extends to actions that are functionally equivalent to issuing or denying a permit. *Crown Simpson,* 445 U.S. at 196, 100 S.Ct. 1093 (holding that EPA's decision to veto a state-issued permit is reviewable by a circuit court because the veto had "the precise effect" of denying a permit). In this Circuit, examples of other functional equivalents include denial of an application for a variance from NPDES permitting standards, *Georgia–Pacific Corp. v. EPA,* 671 F.2d 1235, 1239 (9th Cir.1982), and the extension of existing NPDES permits, *Pacific Legal Found., v. Costle,* 586 F.2d 650, 654–55 (9th Cir.1978), *rev'd on other grounds,* 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980). EPA does not explain, however, how the promulgation of a regulation that defines certain silvicultural sources as nonpoint sources is the "functional equivalent" of issuance or denial of a NPDES permit. The court agrees with EPIC that the "pre-

10. The 1977 amendments to the CWA cast doubt on the substantive basis for the Court's decision in *Crown Simpson,* but the jurisdic-

tional reasoning remains applicable. *American Paper Inst. v. EPA,* 890 F.2d 869, 874 n. 7 (7th Cir.1989).

cise effect" of such a regulation is to exclude sources from the NPDES program, whereas the issuance or denial of a permit, as a matter of statutory mandate, only occurs when there are point sources regulated by the NPDES program. Therefore, circuit court review is not invoked by this line of cases.

### 2. Review of Underlying Permit Procedures

Relying on two Ninth Circuit cases that reviewed the Phase I stormwater regulations, *American Mining* and *NRDC v. EPA*, EPA next argues that circuit court review of the silvicultural regulation is available because it is properly understood as a rule regulating permitting. *See American Mining Cong.*, 965 F.2d at 763 (stating that section 509(b)(1)(F) "allows us to review the regulations governing the issuance of permits under section 402"); *NRDC v. EPA*, 966 F.2d at 1296 (stating that circuit courts "have the power to review rules that regulate the underlying permit procedures"). Both cited to a D.C. Circuit case, *NRDC v. EPA*, 656 F.2d 768, 775 (D.C.Cir.1981), which found that it had jurisdiction over CWA regulations governing criteria for variances from secondary treatment requirements. Assuming jurisdiction, the D.C. Circuit declared, defends against the "perverse situation" in which the court "will be able to review the grant or denial of the permit, but will be without authority to review directly the regulations on which the permit is based." *Id.* (citing *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 136, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977)).

EPA points to the similarities between the Ninth Circuit cases and the present action. In *NRDC v. EPA*, the Ninth Circuit considered regulations that exempted certain activities from immediate permitting under the NPDES program. 966 F.2d at 1301–08. For example, the Circuit reviewed an EPA regulation defining "discharge associated with industrial activity" so as not to include "light industry" discharges. *Id.* at 1304–05. Similarly, in *American Mining*, the Circuit considered whether EPA could include discharges from inactive mines as a "discharge associated with industrial activity." 965 F.2d at 764–66. EPA reads these cases to stand for the proposition that challenges to regulations defining which activities are subject to or excluded from the NPDES permit program are properly brought in the court of appeals.

EPIC contends, however, that *NRDC v. EPA* and *American Mining* should be read narrowly lest they make the specific language of section 509(b)(1) meaningless. EPIC first argues that these cases only give the circuit courts power to review permitting rules enacted pursuant to section 301. While the Ninth Circuit did rely on a D.C. Circuit case reviewing limitations pursuant to section 301,[11] this court cannot accept EPIC's argument because there is no indication in either *NRDC v. EPA* or *American Mining* that the stormwater regulations at issue were promulgated as effluent limitations under section 301. Second, EPIC argues that a rule eliminating certain sources from NPDES requirements by defining them as nonpoint in nature is not a provision governing issuance of permits or regulating underlying permit procedures. In order for such rules to exist, EPIC alleges, there must

---

**11.** In *NRDC v. EPA*, the D.C. Circuit specifically found that the regulations were "effluent limitations ... under section 1311 [section 301 of the CWA]", and thus the court had jurisdiction pursuant to section 509(b)(1)(E).

656 F.2d at 775. Neither Ninth Circuit decision explains why the reasoning in a different jurisdictional provision should give the circuit courts power to review actions under section 509(b)(1)(F).

first be point sources subject to permit requirements. This court agrees.

EPA replies that EPIC's reading flies in the face of *NRDC v. EPA*, which found jurisdiction over regulations that excluded certain sources from permitting. Despite EPA's protestations, EPIC's argument is not at odds with *NRDC v. EPA*. There, the court reviewed regulations exempting sources from immediate permit requirements; such exemptions allowed sources to remain without a permit during the five-year moratorium. The question in *NRDC v. EPA* was not whether the sources should be subject to the NPDES program at all, but whether EPA should require permits during Phase I of its permitting process. Thus, the regulations directly governed permit procedures by determining when permitting would occur. In the action at bar, there can be no underlying permit procedures for silvicultural sources, because they are not subject to the NPDES program.[12]

EPA contends that such a conclusion is illogical, as it would allow circuit courts to review rules that subjected certain sources to the NPDES program but not those that excluded the same sources. Given the specific language of the jurisdictional provision and the rationale behind circuit court review of underlying procedures, however, such an outcome is reasonable. Because EPIC challenges a decision that in effect excludes sources from the NPDES program, the circuit courts will never have to confront the issuance or denial of a permit for these sources. The Ninth Circuit, by virtue of section 122.27, will never have to consider on direct review an action involving the denial of a NPDES permit for pollutant discharges resulting from silvicultural road construction.[13] Thus, a district court taking juris-

12. The Ninth Circuit's recent decision on the Phase II stormwater regulations is not to the contrary. Environmental plaintiffs challenged, among other decisions, the EPA's failure to regulate stormwater from forest roads under section 402(p)(6) of the CWA, the catch-all stormwater provision. *Environmental Def. Ctr.*, 319 F.3d at 431. In ruling against the plaintiffs, the court found that section 402(p)(6) did not encompass forest roads since the section was "specifically intended to address stormwater pollution from industrial and municipal sources, not agriculture." *Id.* at 432. The court based its jurisdiction over the entire action on section 509(b)(1) but did not cite a specific provision. *Id.* at 408. The parenthetical to the citation, however, indicates that the court found a basis in either section 509(b)(1)(F) or 509(b)(1)(E). *Id.* (describing section 509(b)(1) as "assigning review of EPA effluent and permitting regulations to the Federal Courts of Appeals"). The court did not address the specific issue facing this court, as the court found that the challenge was not to the 1976 silvicultural regulation but to the agency's Phase II decision. *Id.* at 432. While the circuit court stated in dicta that review of the regulation was pending in the D.C. Circuit as part of *American Farm Bu-*

reau, *id.* at 433 n. 55, the referenced action does not in fact include the silvicultural regulation. Appellate jurisdiction over the EPA's decision to exclude forest road sources from Phase II regulation does not contradict this court's analysis. As the court in *Environmental Defense Center* noted, section 402(p)(6) "does not require that the 'comprehensive program' be limited to the use of NPDES permits." *Id.* at 432. EPA could have regulated such sources in another manner, as long as the program met statutory requirements. *Id.* Thus, in deciding not to regulate forest road sources under section 402(p)(6), EPA did not exclude the sources from the NPDES program in the same manner as the nonpoint source provision does in section 122.27.

13. PALCO argues that a permit might issue for pollution from a source that falls squarely within the definition of silvicultural nonpoint sources, in which case the concerns of *NRDC v. EPA* would become reality. This hypothetical is far-fetched at best. A discharger must apply for a permit, 40 C.F.R. § 122.21(a)(1), and the EPA or state cannot issue a permit until the application is complete, *id.* § 122.21(e)(1). Because of section 122.27, a logging company would not need to apply for

diction over a challenge to the silvicultural regulation does not create the same awkwardness for a circuit court as that described in the D.C. Circuit case of *NRDC v. EPA.*

EPA argues that circuit courts should review all actions related or attendant to the NPDES program. But such an interpretation stretches CWA's jurisdictional statute far beyond its plain language to the point of absurdity. The specific language of section 509(b)(1)(F) allows direct review of an EPA action in issuing or denying any permit under section 402. Had Congress wanted to grant original appellate review of more fundamental decisions, it could have done so. " '[T]he complexity and specificity of section [509(b)] ... suggests that not all such actions are so reviewable. If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others.' " *Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1313 (9th Cir.1992) (quoting *Bethlehem Steel Corp. v. EPA,* 538 F.2d 513, 517 (2d Cir.1976)).[14] Indeed, a recent Ninth Circuit decision interpreting section 122.27 implied that appellate jurisdiction would not lie in a direct challenge to the regulation. *League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181, 1190 n. 8

(9th Cir.2002) ("It is far from clear that review of [section 122.27] would be precluded by section 1369(b), particularly in light of the fact that this court has counseled against expansive application of section 1369(b).") (citing *Longview Fibre,* 980 F.2d at 1313). Therefore, this court finds no basis in section 509(b)(1)(F) for circuit court review of this challenge.

C. *Section 509(b)(1)(E): Promulgation of Effluent Limitations under Section 301*

■ In the alternative, EPA and PALCO argue that direct appellate review should lie under section 509(b)(1)(E). In pertinent part, section 509(b)(1)(E) allows for circuit court review of the EPA Administrator's action "in approving or promulgating any effluent limitation or other limitation under section 1311 [section 301 of the CWA]." 33 U.S.C. § 1369(b)(1)(E). The term "effluent limitation" is defined as "any restriction ... on the quantities, rates, and concentrations of chemical, physical, biological and other constituents which are discharged from point sources into navigable waters ... including schedules of compliance." *Id.* § 1362(11). The EPA Administrator is required by section 301 to establish effluent limitations for point sources of pollutants based on applicable pollution control technology. *Id.*

---

a permit for pollution from silvicultural nonpoint sources.

**14.** The *Longview Fibre* opinion is worth quoting at length:

The specificity and precision of section 1369, and the sense of it, persuade us that it is designed to exclude the unlisted section 1313. [citation omitted]. It would be an odd use of language to say "any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title" in § 1369(b)(1)(E) if the references to particular sections were not meant to exclude others. The negative pregnant is all the more obvious because in the six subsection provi-

sion at 1369(b)(1), each subsection specifies a particular statute or subsection of a statute; the distinctions are so fine that review of a "standard of performance under section 1316" is established by a different subsection from review of a "determination pursuant to section 1316(b)(1)(C)." 33 U.S.C. § 1369(b)(1)(A), (B). No sensible person accustomed to the use of words in laws would speak so narrowly and precisely of particular statutory provisions, while meaning to imply a more general and broad coverage than the statutes designated. In this case, *expressio unius est exclusio alterius.*

980 F.2d at 1313.

§ 1311(b), (e). The effluent limitations may be modified in certain defined circumstances. *See, e.g., id.* § 1311(g) (nonconventional pollutants), (k) (innovative technologies), (p) (coal remining operations).

EPA contends that the silvicultural regulation falls within section 509(b)(1)(E) because it was part of a set of regulations found reviewable by the D.C. Circuit under that section. *NRDC v. EPA,* 673 F.2d 400 (D.C.Cir.), *cert. denied,* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982). In *NRDC v. EPA,* the D.C. Circuit reviewed challenges to the CWA portion of the 1980 Consolidated Permit Regulations ("CPRs"). *Id.* at 402. Noting that the "EPA cited § 301 as a statutory basis for the CPRs and the CPRs set out procedures for obtaining permits that comply with § 301," the D.C. Circuit found "[i]t is thus fair to say that the CPR's were promulgated under § 301." *Id.* at 405 n. 15. The CPRs were limitations within the meaning of section 509(b)(1)(E) because they were collectively " 'a limitation on point sources and permit issuers' and 'a restriction on the untrammeled discretion of the industry' that existed before passage of the CWA." *Id.* at 405 (quoting *Virginia Elec. & Power Co. v. Costle,* 566 F.2d 446, 450 (4th Cir.1977)). The court did not determine whether the CPRs were "effluent limitations" or "other limitations." *Id.* at 404 n. 11. ("Because [section] 509(b)(1)(E) provides for our review of both effluent limitations and other limitations, we see no need to determine that the CPRs are one or the other. It suffices

that they fit within the statutory disjunctive phrase.").

EPIC replies that *NRDC v. EPA* is not applicable to this action, since the silvicultural regulation was never specifically challenged in the consolidated cases before the D.C. Circuit. The EPA agrees that to its knowledge the regulation was not at issue in those cases,[15] but the D.C. Circuit's analysis should still be applied here because the silvicultural regulation was recodified in 1980 as part of the CPRs. *See* 45 Fed.Reg. at 33,446–47 (repromulgating the silvicultural regulation as 40 C.F.R. § 122.58). In support of this argument, PALCO cites *Trustees for Alaska v. EPA,* 749 F.2d 549, 559 (9th Cir.1984), in which the Ninth Circuit adopted the D.C. Circuit's reasoning in *NRDC v. EPA* and applied it to a regulation that was part of the CPRs. Specifically, the Circuit found that a regulation on the burden of proof in permit hearings that was included in the CPRs is reviewable in the circuit courts pursuant to section 509(b)(1)(E). *Id.*

While defendants present a strong argument, this court finds that the nonpoint source provision of the silvicultural regulation is not an "effluent limitation or other limitation" under section 301. Firstly, the silvicultural regulation as a whole was never propounded under the authority of section 301. 41 Fed.Reg. at 6283. The fact that EPA generally cited section 301 for its authority to promulgate the CPRs does not lead to the conclusion that the silvicultural regulation was then based on such authority. Although the regulation was

---

**15.** In its review of the case law, the court finds no indication that the silvicultural regulation was at issue in the consolidated cases before the D.C. Circuit. The petitioners challenged about fifty-five issues, of which forty-seven were raised by industry litigants. *NRDC v. EPA,* 822 F.2d 104, 109 (D.C.Cir. 1987). EPA and the industry litigants entered into an NPDES Settlement Agreement in

1982 with respect to twenty-seven of the issues. *Id.* The EPA then revised the NPDES-related CPRs. *Id.;* 49 Fed.Reg. 37,997 (Sept. 26, 1984). Neither the revised 1984 regulations nor the later court challenges by industry and environmental litigants concern silvicultural activities. *See NRDC v. EPA,* 859 F.2d 156, 165 (D.C.Cir.1988); *NRDC v. EPA,* 822 F.2d at 109.

repromulgated with the CPRs, the repromulgation did not change the meaning of the regulation. *Compare* 41 Fed.Reg. at 24,712 *with* 45 Fed.Reg. at 33,446–47 (incorporating comment on nonpoint sources into text). Similarly, the fact that the 2000 proposed rulemaking on TMDLs was issued generally under the authority of section 301, *see* 65 Fed.Reg. at 43,586, does not change the specific authority of the silvicultural regulation since the EPA did not amend the regulation in its final rulemaking. Therefore, the court finds that the authority for the silvicultural regulation remains sections 304, 402 and 501.

Although *Trustees for Alaska* could be read to stand for the proposition that all regulations codified as CPRs are subject to appellate review under section 509(b)(1)(E) as limitations under section 301, this reading would be contrary to the narrow interpretation of the same jurisdictional provision later counseled by the Ninth Circuit in *Longview Fibre*. In *Longview Fibre*, this Circuit found that a TMDL regulation, which the parties agreed was an effluent limitation, was not "under section 301" because the EPA issued the regulation under a different section. 980 F.2d at 1311. The Circuit did not accept petitioners' arguments that "under section 301" should be interpreted broadly to include all effluent limitations, even if the specific limitation was not listed in section 301. *Id.* at 1312. Thus, this court cannot conclude that the nonpoint source provision is "under section 301" based only on the fact that it was repromulgated as part of the CPRs. Even if this court were to apply the broad reasoning of *NRDC v. EPA* as accepted by *Trustees for Alaska,* the nonpoint source provision could not be based on section 301 because it does not "set out procedures for obtaining permits that comply with [section] 301," 673 F.2d at 405 n. 15. By its nature, the provision ensures that permit procedures will not apply to these sources. In contrast, *Trustees for Alaska* concerned the burden of persuasion in a permit hearing, which is clearly a "procedure for obtaining permits."

Secondly, even if the nonpoint source provision of the silvicultural regulation could somehow be construed to be "under section 301," the court finds that the provision is not an "effluent limitation or other limitation." Even under the expansive definition of *NRDC v. EPA,* the provision at issue in this action is not "a limitation on point sources and permit issuers" or "a restriction on the untrammeled discretion of the industry." Defining a silvicultural source as a nonpoint source does not restrict industry by limiting pollution from point sources or requiring permits to be issued in a stricter fashion. In effect, the nonpoint source provision exempts sources of pollution from the admittedly tighter controls accorded point sources under the CWA. Although courts have broadly construed the definition of "effluent limitation or other limitation," *see, e.g., NRDC v. EPA,* 656 F.2d at 775 (finding variance regulations to be effluent limitations because "[a]s a practical matter they restrict the discharge of sewage by limiting the availability of a variance to a class of applicants which does not include all coastal municipalities"), neither EPIC nor PALCO has cited any cases that find a provision such as this one to be a "limitation." In fact, the Ninth Circuit has held that section 301 limitations apply only to point sources. *Oregon Natural Res. Council,* 834 F.2d at 848–50 (finding plaintiffs did not have a cause of action under section 505(a) to challenge water quality standards for nonpoint sources because section 301 concerned effluent limitations, which are only applicable to point sources of pollution).

D. *Policy Reasons for Original Appellate Review under Section 509(b)(1)*

■ In an attempt to avoid the preceding reasoning, the EPA and PALCO argue

that *NRDC v. EPA* did not rest its jurisdiction only on whether CPRs are limitations under section 301, but also on the policy rationale that generalized rules are better suited for review in the circuit courts. Responding to the industry petitioners' argument that the CPRs are not specific limitations, the D.C. Circuit stated that the "case for first-instance judicial review in a court of appeals is stronger for broad, policy-oriented rules than for specific, technology-based rules." *NRDC v. EPA*, 673 F.2d at 405. The D.C. Circuit specifically voiced concerns about national uniformity and the lack of need for district courts' factfinding mechanisms.[16] *Id.* at 405 n. 15.

This court recognizes that the nonpoint source provision of section 122.27 is a broad, policy-oriented rule, and that the outcome of this action has nationwide implications. The court is cautious, however, not to force an interpretation of section 509(b)(1) that will stray too far from its language because section 509(b)(2) bars judicial review of any action that falls within section 509(b)(1) "in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2). The Ninth Circuit has counseled against construing the jurisdictional language broadly, noting the "peculiar sting" of section 509(b)(2). *Longview Fibre*, 980 F.2d at 1313. While the agency action at issue in *Longview Fibre* was a specific numeric limit—dioxin discharges

to the Columbia River—the Circuit's concern with barring defendants from certain arguments may be even more applicable to broad, policy-oriented rules than to narrow, technology-based ones.

Moreover, as EPIC points out, a district court took jurisdiction over the challenge to the original 1973 EPA regulation, a broad rule which exempted certain silvicultural point sources from NPDES permitting. *NRDC v. Train*, 396 F.Supp. at 1402. Although the D.C. District Court did not specifically address its jurisdiction, a court must raise the issue *sua sponte* if there is any question as to whether it has subject matter jurisdiction over an action. *Ruhrgas v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (Because subject matter jurisdiction "keep[s] the federal courts within the bounds the Constitution and Congress have prescribed," such "delineations must be policed by the courts on their own initiative even at the highest level."); Fed. R.Civ.P. 12(h)(3) ("Whenever it appears ... that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). This court must presume, then, that the D.C. District Court did not have any doubts about its jurisdiction.

The court therefore holds that EPIC's third claim of relief against EPA does not fall within section 509(b)(1)(E) or 509(b)(1)(F). Consequently, the "no other

---

**16.** In contrast to the D.C. Circuit's interpretation, and in the absence of any enlightening legislative history, it seems just as likely that Congress intended to grant original appellate jurisdiction over fact-specific actions that already had a detailed agency record for the circuit courts to review. Then, the courts of appeals would not need to rely on district courts' factfinding mechanisms. *See Save the Bay v. EPA*, 556 F.2d 1282, 1292 (5th Cir.) (in finding that the EPA's failure to veto a permit was not reviewable under section 509(b)(1)(F), court "assume[d] Congress drafted the provision with reference to the

rule that our original jurisdiction can only extend to 'agency action capable of review on the basis of the administrative record.'") (quoting *Investment Co. Inst. v. Board of Governors of the Fed. Reserve Sys.*, 551 F.2d 1270, 1278 (D.C.Cir.1977)). This would comport with the "specificity and precision" of the section 509(b)(1) language noted by the Ninth Circuit in *Longview Fibre*. 980 F.2d at 1313. The court realizes, however, that such an interpretation would be in tension with many decisions on section 509(b)(1), which have over the years tended to broaden the scope of circuit court jurisdiction.

adequate remedy" requirement of the APA is met, and EPIC may bring its claim under the APA in this court.

## II. *Statute of Limitations*

Defendants next move to dismiss EPIC's complaint on the grounds that the six-year statute of limitations applicable to APA actions, 28 U.S.C. § 2401(a), prohibits EPIC from challenging the legality of section 122.27. PALCO argues that the last final agency action on the nonpoint source provision occurred when EPA repromulgated the regulation in 1983 to "deconsolidate" it from the CPRs. *See* 48 Fed. Reg. 14,146, 14,164 (Apr. 1, 1983). EPA acknowledges that a final agency action may have occurred in 2000 but argues that any review of the action would be limited to the agency's decision not to amend the regulation in the proposed manner. EPIC replies that its action is not barred by the statute of limitations because it is bringing an "as applied" challenge. In the alternative, EPIC argues that the EPA's decision in 2000 not to amend the regulation was a final agency action that opened the provision for review, and thus the challenge is timely.

### A. *"As Applied" Exception*

 In an abrupt shift of argument, EPIC characterizes its action as an "as applied" challenge to an underlying regulation that should be allowed without regard to the applicable statute of limitations. Such a challenge may be brought in two situations, neither of which apply to the action at bar. First, it is clear that when an agency applies a regulation to a defendant in an enforcement proceeding, that party may challenge the validity of the regulation even if the regulation was promulgated long before. *National Labor Relations Bd. v. Federal Labor Relations Auth.,* 834 F.2d 191, 195–96 (D.C.Cir.1987). The challenger need not be a defendant in a court proceeding, but may bring a court action against the agency to review the administrative proceeding in which the agency applied the rule. *Commonwealth Edison Co. v. Nuclear Regulatory Comm'n,* 830 F.2d 610, 613 n. 2 (7th Cir. 1987). Second, a party may petition the agency to amend or rescind the regulation, then seek judicial review of the agency's denial on substantive grounds. *Public Citizen v. Nuclear Regulatory Comm'n,* 901 F.2d 147, 152 (D.C.Cir.1990); *National Labor Relations Bd.,* 834 F.2d at 196. *See also Wind River Mining Corp. v. United States,* 946 F.2d 710, 715 (9th Cir.1991) (adopting D.C. Circuit analysis for as applied challenges).

EPIC has not been the object of any enforcement proceeding by the EPA. PALCO—not EPIC—is the regulated entity, and PALCO does not contest the rule as applied to it. All of the cases cited by EPIC but one involve challenges by regulated entities. *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (challenge by municipality to migratory bird rule after Army Corps denied CWA permit); *Wind River Mining Corp.* (challenge by mining company against Bureau of Land Management decision prohibiting ore extraction); *Commonwealth Edison Co.* (challenge by utility to Nuclear Regulatory Commission rule setting fees for license application review work); *National Labor Relations Bd.* (challenge by union to Federal Labor Relations Authority rule precluding remedies for union representatives); *Functional Music v. Federal Communications Comm'n,* 274 F.2d 543 (D.C.Cir.) (challenge by owner of FM station to Federal Communications Commission rules restricting subscription-based services), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). The lone exception is a district court case in which the court dismissed without prejudice plaintiff's as ap-

plied challenge. *Florida Keys Citizens Coalition v. West,* 996 F.Supp. 1254 (S.D.Fla.1998). This case does not aid EPIC. The court held that any facial challenge by plaintiffs to the regulation at issue was time-barred and merely gave plaintiffs the opportunity to return to court to demonstrate that they could bring an as applied challenge. *Id.* at 1256–57.

EPIC has also not directly petitioned the EPA to amend or rescind the regulation. *See Public Citizen,* 901 F.2d at 152 (stating in dicta that citizen plaintiff could bring a substantive challenge to a rule after petitioning the agency). EPIC's last-minute correspondence requesting the Regional Board to issue permits to PALCO for its discharges does not satisfy this requirement. Despite EPIC's attempt to cast this action as a substantive challenge to application of section 122.27, EPIC is directly challenging the legal validity of the regulation. In fact, EPIC acknowledges that its action poses "pure questions of law." Pl.'s Opp'n at 22. *Cf. Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1204–05 (D.C.Cir.1998) (as applied challenge provides a specific factual context for a regulation, ensuring ripeness), *cert. denied,* 527 U.S. 1021, 119 S.Ct. 2366, 144 L.Ed.2d 770 (1999). EPIC may not escape the applicable statute of limitations by trying to couch its facial challenge as an as applied claim.

## B. *Final Agency Action*

■■■ The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. APA claims must be brought within six years of the accrual of the right of action. 28 U.S.C. § 2401(a). A right of action under the APA accrues from the date of final agency action. *Spannaus v. United States Dep't of Justice,* 824 F.2d 52, 56 (D.C.Cir.1987). To be a final action, the action must meet two criteria. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it

must not be of a merely tentative or inter-locutory nature." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178, 117 S.Ct. 1154 (citation omitted); *see also City of San Diego v. Whitman,* 242 F.3d 1097, 1102 (9th Cir.2001) (for agency action to be final it must "impose an obligation, deny a right or fix some legal relationship").

■■■ Relying on EPA's characterization of its decision in the 2000 rulemaking, PALCO contends that EPA did not complete its decisionmaking process, and thus the agency action is not final under the first prong of *Bennett.* In the 2000 preamble, EPA stated it was "not taking final action in today's rule on the proposed changes to the NPDES regulations applicable to silviculture." 65 Fed.Reg. at 43,-652. EPA also stated it did not plan to "finalize the August 1999 proposal" to alter section 122.27 but rather would "continue to evaluate how to best address the water quality impacts from forestry." *Id.* EPA made clear, however, that it had "no plans at present to repropose changes to the silvicultural exemption." *Id.* Such a statement is clearly not "of a merely tentative or interlocutory nature." *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154.

■■■ Nor does PALCO acknowledge that the court is not bound by EPA's position on whether its action is final. *See Abramowitz v. EPA,* 832 F.2d 1071, 1075 (9th Cir.1987) ("We do not believe the Agency's own designation of its action determines the jurisdictional issue."), *superseded by statute on other grounds as recognized in Hall v. EPA,* 263 F.3d 926, 937 (9th Cir.2001). The fact that EPA might at some undetermined point in the future address silviculture pollution fails to alter the fact that its determination not to

amend section 122.27 consummated its decisionmaking process. *Id.* (finding final action even when agency declared it was "'holding open' the question of how to act" on the matter and was "'not taking final actions ... at this time'") (quoting 49 Fed.Reg. 30,304 (July 30, 1984)). *But see Edison Elec. Inst. v. EPA,* 996 F.2d 326, 332 (D.C.Cir.1993) (noting that EPA's final ruling stating it would continue to evaluate the issue would likely make any review premature). This court finds that EPA's decision not to amend the regulation marked the consummation of its decisionmaking process, despite its generalized statement to continue studying the problem. "It is the effect of the action and not its label that must be considered." *Abramowitz,* 832 F.2d at 1075.

▮▮▮▮ PALCO also argues that the agency action does not meet the second prong of *Bennett.* Since EPA did not change its existing regulation, PALCO contends, the legal regime was not altered. *See Bennett,* 520 U.S. at 178, 117 S.Ct. 1154 ("the second [requirement] is met because ... [the action] alter[s] the legal regime to which the action agency is subject"). This interpretation narrows the scope of *Bennett* beyond reason. Taken to its logical extreme, even if EPA repromulgated section 122.27 as it now stands and explicitly stated that it was taking final action, EPIC would not be able to challenge EPA's action. EPA's decision to not

to amend the silvicultural regulation has the direct, immediate legal consequence of continuing to exempt a whole class of silvicultural activities from the NPDES permit program. *Cf. Franklin v. Massachusetts,* 505 U.S. 788, 798, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (presentation by Secretary of Commerce to President served "more like a tentative recommendation than a final and binding determination"); *Dalton v. Specter,* 511 U.S. 462, 474, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (submission of base closure recommendations to President not a final action when President had discretion to reject them). Therefore, this court finds that both prongs of *Bennett* have been met, and the EPA's decision not to amend the silvicultural regulation is a final agency action.

### C. *Scope of EPA Action*

▮▮▮▮ Although EPA does not contest that there was a reviewable agency action, it argues that the scope of any challenge to the action is limited to the proposed amendment. EPIC replies that EPA not only proposed an amendment to the regulation, but it also reopened the underlying silvicultural regulation for review.[17] When "an agency's actions show that it has not merely republished an existing rule ... but has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order." *Public Citizen,* 901 F.2d at 150.[18] *See also Kennecott*

---

**17.** EPIC also contends that the EPA's interpretation of the silvicultural regulation in the preamble to the rulemaking is reviewable on its own. An interpretation is only reviewable if it has a binding effect, an analysis separate from whether the preamble reopened a regulation for review. *Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1420 (D.C.Cir.1998). This court finds no evidence that the interpretation alone created a "direct and immediate" effect, *Kennecott Utah Copper Corp. v. United States Dep't of Interior,* 88 F.3d 1191, 1223 (D.C.Cir.1996), as it merely restated the EPA's

longstanding approach to silvicultural sources.

**18.** EPA argues that *Public Citizen* is distinguishable because the agency decision made permanent an earlier temporary decision. In contrast, section 122.27 was never temporary; it was issued in 1976 as a final regulation. This court finds that the determinative question in *Public Citizen,* one in a line of many D.C. Circuit cases considering whether to reopen a regulation for review, was whether the later rulemaking reexamined the earlier deci-

*Utah Copper Corp. v. United States Dep't of the Interior,* 88 F.3d 1191, 1213 (D.C.Cir.1996) (a regulation is reopened if "an agency in the course of a rulemaking proceeding solicits comments on a pre-existing regulation or otherwise indicates its willingness to reconsider such a regulation by inviting and responding to comments"). A court must consider the "entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened." *Public Citizen,* 901 F.2d at 150.

▆▆▆ At the outset, this court looks to EPA's description of its proposed rulemaking in 1999. "[I]f in proposing a rule the agency uses language ... that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy should be allowed." *Id.* EPA stated that it was "proposing to modify its current interpretation of the term 'point source' with respect to discharges associated with silviculture." 64 Fed.Reg. at 46,-077. After discussing the 1987 stormwater amendments, the EPA identified a "gap in regulatory coverage" between discharges associated with silvicultural activity and discharges from other activities regulated as point sources. *Id.* The proposal, EPA stated, would remove this gap for silvicultural sources "currently identified as a discrete category of 'non-point sources' excluded from the opportunity for regulation under the NPDES permitting program" and replace it with case-by-case designation. *Id.*

EPA contends that the proposal only discussed the current rule as background to the proposed change. While EPA has a strong argument, the agency explicitly invited comments on both the underlying nonpoint source provision and the proposed case-by-case designation authority. *See* 64 Fed.Reg. at 46,079 ("EPA invites comments on removing the categorical exemption for runoff from certain silvicultural activities *and* on its intention to limit federal designation authority to discharges into waters for which EPA has established a TMDL.") (emphasis added). In response, EPA received comments on the validity of the exemption.[19] These are summarized in the final decision:

> Other commenters argued that EPA cannot and should not shield sources with discharges from discrete, discernible, confined conveyances from NPDES permit requirements. These commenters asserted that all sources with discharges from discrete, discernable, confined conveyances are and should be required to obtain NPDES permits.

65 Fed.Reg. at 43,652. *See also id.* ("Many commenters encouraged EPA to require NPDES permits for all silvicultural operations that discharge pollutants from a point source as opposed to the proposed case-by-case approach.").

▆▆▆ This court finds that the EPA's call for comments reopened the underlying rule for review. If an agency "explicitly invited comments on the precise question for which petitioners now seek review," even when the agency did not specifically propose to change the rule in that manner, the rule is deemed reopened. *Edison Elec. Inst.,* 996 F.2d at 332 (agency solicited comments on both the existing regulation and the proposed alternative). While a plaintiff cannot "bootstrap" himself into federal court by commenting on

sion—not whether the underlying regulation was temporary.

**19.** At argument, EPA admitted that the agency kept two separate sets of comments—one

for the underlying regulation and one for the proposal. After separating these two issues, EPA cannot now argue that the rulemaking only considered one.

matters not related to a rulemaking and then seeking review of the agency's response to those comments, *American Iron & Steel Inst. v. EPA,* 886 F.2d 390, 398 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990), EPIC has not done so here. As the final agency action occurred on July 13, 2000 and EPIC filed its complaint on July 24, 2001, this court finds that. EPIC's challenge to the nonpoint source provision of the silvicultural regulation is timely.

## *CONCLUSION*

For the foregoing reasons, the court holds that EPIC can pursue its APA claim in this court and that the claim is within the applicable statute of limitations. EPA's motion to dismiss is DENIED and PALCO's motion to dismiss is DENIED IN PART. The court requests further briefing from all parties on the remaining issues in PALCO's motion to dismiss, specifically the proper degree of judicial deference to EPA required by *Chevron v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Supplemental briefing by defendants is due June 23, 2003, plaintiff's opposition is due July 7, 2003 and a hearing is scheduled for July 28, 2003. Briefing is not to exceed 25 pages, and the parties are directed not to submit replies.

IT IS SO ORDERED.